No. 118,563

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of

K.L.B. and A.S.B.,
Minor Children.

SYLLABUS BY THE COURT

1.

A party may raise subject matter jurisdiction at any time before any court.

2.

The purpose of the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA) is to avoid jurisdictional competition between courts of different states and to make sure only one state at a time has jurisdiction over child custody matters in regard to a particular family.

3.

If a court in another state has not commenced a proceeding exercising jurisdiction over child custody matters in regard to a particular family or has otherwise declined to exercise such jurisdiction, there is no jurisdictional competition with a state that has exercised such jurisdiction in accordance with the UCCJEA.

4.

If a state asserts jurisdiction on an emergency basis pursuant to the UCCJEA and no proceeding exists in any other state which might have exercised jurisdiction over the same family, the orders issued by the court exercising emergency jurisdiction become a final determination.

1

Appeal from Sedgwick District Court; KEVIN M. SMITH, judge. Opinion filed October 19, 2018. Affirmed.

*Jordan E. Kieffer*, of Dugan & Giroux Law, Inc., of Wichita, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before BRUNS, P.J., MCANANY, J., and BURGESS, S.J.

BURGESS, J.: M.K. (Mother) is the mother of K.L.B. (YOB: 2013) and A.S.B. (YOB: 2015). The family is originally from Kentucky. After being in Kansas for a week, the children were taken into State custody. Mother was eventually extradited to Kentucky on Kentucky charges. The Sedgwick County District Court ultimately terminated Mother's parental rights. Mother appeals, arguing (1) the district court did not properly exercise jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA); and (2) substantial competent evidence did not support the court's finding that she was unfit and would remain so for the foreseeable future. Finding no error, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On July 6, 2016, deputies responded to a suspicious character call in Wichita, Kansas. On arrival at the scene, they found Mother, who began making "suicidal statements." She told the deputies that her two children, K.L.B. and A.S.B., were staying with a couple she had met the day before at a QuikTrip. Father had also recently been arrested and extradited to Kentucky. Mother was hospitalized, and a deputy took K.L.B. and A.S.B. into police protective custody and transported them to the Wichita Children's Home (WCH). WCH reported that the children were "extremely dirty, having full diapers and wearing ill-fitting clothing" when they arrived.

At the hospital, Mother stated that she, Father, and the two children had moved to Wichita about a week earlier. They were originally from Kentucky but had left because Mother was having legal problems as a result of a theft charge. Mother was on probation for that charge. The family had passed through Ohio, West Virginia, Pennsylvania, and Oklahoma, before deciding to start a new life in Wichita. Mother stated they had no friends or family in Kansas.

Mother stated Father had been arrested on the day they arrived in Wichita. After that, she had stayed at a motel with the children for five days. During that time, their room was broken into twice. Mother then spent the night at the home of a couple she met at QuikTrip. Mother did not know the couple's last name. Mother lent her truck to the couple's son. When he did not return, Mother left her children with the couple and went to look for the truck. That is when police found her.

Mother also has a 20-year-old daughter and a 17-year-old son still in Kentucky. She left the son in the care of her older daughter, but Kentucky Child Protective Services (CPS) had taken him into custody. Mother stated she did not want to return to Kentucky because CPS was also trying to take custody of K.L.B. and A.S.B.

The State filed a child in need of care (CINC) petition in Sedgwick County. After a hearing on July 11, 2016, the district court entered temporary custody orders. The form used for the district court's journal entry included standard findings that jurisdiction and venue were proper, and that the court had original jurisdiction under K.S.A. 2016 Supp. 38-2203. The district court also ordered the district attorney's office to contact the appropriate court in Kentucky.

Several weeks later, the district court held a disposition hearing. At the hearing, Mother answered no contest to the allegations in the CINC petition. The State told the district court that it had contacted officials and a child welfare agency in Kentucky, and

3

they had conveyed that they did not intend to assume jurisdiction. Mother requested a hearing about the UCCJEA with officials from Kentucky to learn why they were declining jurisdiction. The district court asked Mother if she would be okay with a "judge-to-judge" call to verify that the Kentucky court was not retaining jurisdiction. Mother agreed as along as she and her counsel could be present. The district court continued disposition.

Two weeks later, on August 19, 2016, the district court held another disposition hearing. The court noted it had continued disposition to determine whether Kentucky wished to exercise jurisdiction since both parents were from Kentucky and the children had lived there for a substantial time. The district court explained that it had contacted the appropriate court in Kentucky. The Kentucky court did not want a hearing or anything on the record and declined to exercise jurisdiction. The State advised that the district court had emergency jurisdiction and its jurisdiction continued because Kentucky had declined to take over the case. In its orders, the district court found that the "Family Law Court in Hardin County, Kentucky, has been made aware of this CINC proceeding and has declined to exercise their jurisdiction over this matter."

The State eventually moved to terminate Mother's parental rights. The district court held a termination hearing on August 2, 2017. At the hearing, Mother testified that she was currently living at The Women's Healing Place in Louisville, Kentucky, and she had been there since March 2017. Mother explained The Women's Healing Place was a rehabilitation center for women. Mother was placed there as a condition of her parole from a felony theft conviction in Kentucky. Before living in the rehab center, Mother was in jail in Kansas from August 2016 to January 2017 because she did not want to sign the extradition papers and leave her children. Once Mother returned to Kentucky, she was in jail from January 2017 until March 2017.

4

Mother told the district court that she left Kentucky with Father and the girls around the beginning of June. Mother knew she should not have left Kentucky because she was on probation, but she was using drugs and alcohol at that time and made bad decisions. According to Mother, the family first went to Oklahoma and went camping with some friends there. The family arrived in Wichita at the end of June and was planning to continue on to Colorado for another week or so of camping. Before leaving for Colorado, Father was arrested on an outstanding Kentucky warrant in Kansas.

In early July, sheriff's deputies took Mother to the hospital because she was high and "psychotic." At the time, Mother was using methamphetamines and Xanax. Mother admitted to using methamphetamine while she was taking care of the minor children. Mother explained she began using methamphetamine and pain pills a few months before she was arrested. Mother testified that she had not used alcohol or drugs since being placed in custody and had never failed a urinalysis test at the rehab center. She stated she stopped using because the "pain of being separated from [her children] is the most heart-wrenching pain [she's] ever been through."

Mother testified that K.L.B. was autistic. Mother had gotten K.L.B. diagnosed while living in Kentucky. K.L.B. had developmental delays, would not make eye contact, and had been non-verbal. In Kentucky, a speech therapist and a developmental interventionist would come to the house and work with K.L.B. a few days each week. K.L.B. did not receive any of these services while the family was in Oklahoma.

Mother admitted that she and Father had had domestic violence issues in the past. In 2014, she had tried to get an emergency order of protection against Father. Father had pushed and spit on Mother and yelled at one of her older children. Shortly before arriving in Wichita in 2016, Father got angry at K.L.B. because she was jumping on him, and he pushed her in the chest. Father also had a history of substance abuse, and Mother knew he

5

was using methamphetamines and heroin. Mother ended their relationship while she was in jail in Kansas.

Mother testified she was doing well at her rehab center and she had complied with her program. According to Mother, she could be out in two or three months if she stayed in compliance. The rehab center provided transitional support services and helped residents find housing, employment, and transportation. Mother testified she planned to move to Wichita when she was released from the rehab center. She stated she had no family support in Wichita, but she had met a woman at church after her girls went into State custody in Kansas.

Mother testified that she had not seen either K.L.B. or A.S.B. in about a year. K.L.B. had been 3 years old and A.S.B. had been 14 months old the last time Mother saw them. Mother believed it was still best for the children to be with her, even if it took another year to reintegrate. Because Mother had worked as a residential assistant in a home for special needs adults, she believed she knew what it would take to take care of K.L.B. But Mother admitted she still needed to learn sign language because K.L.B. had been learning sign language in her foster home.

Christina Somers, a licensed permanency specialist at St. Francis, also testified at the hearing. She was assigned to K.L.B. and A.S.B.'s case in July 2016. After meeting with Mother, Somers developed case plan tasks that Mother would need to complete to achieve reintegration. These included: (1) complete a SACK assessment and follow any recommendations; (2) complete parenting, budgeting, and nutrition classes; (3) obtain full-time employment; (4) maintain safe and suitable housing; (5) fulfill all obligations arising from her criminal charges; and (6) maintain contact with St. Francis. Somers explained that the main obstacles Mother needed to overcome to achieve reintegration were stability, sobriety, housing, and employment.

6

Somers testified that Mother had three supervised visits with the children at the start of the case. But in August, Mother was arrested on her Kentucky warrants. Somers said Mother's arrest complicated things, but she continued to work with Mother to achieve reintegration. While Mother was in jail in Kansas, Somers tried to set Mother up with a social worker and arrange for Mother to take parenting, budgeting, and nutrition classes. Somers also tried to get Mother on the list for a SACK assessment so she could start drug treatment in jail. Somers continued to meet with Mother in jail and provided her with some of the sign language that K.L.B. was learning.

Somers testified that Mother was extradited to Kentucky in January. After extradition, Somers maintained contact with Mother and helped Mother to complete court orders. When Mother was released to The Women's Healing Place, Somers submitted a referral for Mother's SACK assessment. Somers also tried to find parenting and budgeting classes for Mother to take because Kentucky did not offer those classes.

Somers told the district court that K.L.B. had had a severe regression in her behavior after a 15-minute visit with Father in December 2016. K.L.B. took about six months to recover. Because of this, Somers did not want to resume visits with Mother without input from K.L.B.'s therapist.

According to Somers, The Women's Healing Place had told her that Mother's earliest possible release date was late October or early November, though it could be as late as December. Somers testified Mother would need to maintain sobriety, housing, and employment for at least six to nine months before reintegration became an option. But Somers added that it would be one to two years before she was confident that Mother could meet the children's needs, particularly given K.L.B.'s autism. Under those circumstances, the best case scenario was that reintegration would not be an option until a year after Mother had come back to Wichita.

Somers believed that Mother was unfit because she had no home, she had no job, and she had not seen either child in over a year. Somers also did not believe Mother would become fit in the foreseeable future. Somers explained that she kept seeing the same behaviors in Mother she had seen in the past. For example, Mother had never told Somers she was planning to move back to Wichita. Somers added that if reintegration was put off for another year, A.S.B. would have spent two-thirds of her life in State custody.

Somers also believed that it was in the best interests of the children to terminate Mother's parental rights. She explained that the children had been in custody for over a year. They did not remember Mother, and they did not ask for her. Somers also could not guarantee that Mother could provide a safe, loving home for K.L.B. now or in the future.

Jan Karsak, Mother's friend, also testified at the hearing. Karsak testified she volunteered for her church's ministries for homeless and at-risk people. Karsak met Mother at a Bible study shortly after the children went into custody and stayed in touch with Mother over the course of the past year. Karsak stated Mother seemed remorseful and had changed her behavior to address her problems. Karsak also felt that Mother had tried harder than anyone Karsak had ever worked with to get her children back. Karsak had also offered to let Mother live with her after she was released from The Women's Healing Place.

At the end of the hearing, the district court terminated Mother's parental rights. The district court found Mother unfit under these factors: (1) K.S.A. 2017 Supp. 38-2269(b)(3), use of intoxicating liquors or narcotics; (2) K.S.A. 2017 Supp. 38-2269(b)(5), conviction of a felony and imprisonment; (3) K.S.A. 2017 Supp. 38-2269(b)(7), failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family; (4) K.S.A. 2017 Supp. 38-2269(b)(8), lack of effort on the part of the parent to adjust the parent's circumstances, conduct, or conditions to meet the needs of the child;

and (5) K.S.A. 2017 Supp. 38-2269(c)(3), failure to carry out a reasonable plan approved by the court directed toward the integration of the children into a parental home. The district court also found that Mother was unlikely to become fit in the foreseeable future, and it was in the best interests of the children to terminate Mother's parental rights.

Mother appeals. The district court also terminated Father's parental rights, but he is not part of this appeal.

### DID THE DISTRICT COURT FAIL TO PROPERLY EXERCISE JURISDICTION UNDER THE UCCJEA?

On appeal, Mother argues that the district court lacked jurisdiction under the UCCJEA to terminate her parental rights. She contends that the district court did not properly invoke temporary emergency jurisdiction under K.S.A. 2017 Supp. 23-37,204. And even if the district court had properly exercised temporary emergency jurisdiction, the Kansas court obtained no order from Kentucky allowing it to retain jurisdiction.

The State responds that this court lacks jurisdiction to hear Mother's argument because Mother's notice of appeal does not comply with statutory requirements. Alternatively, it argues that the district court properly determined it had jurisdiction over the case. The State notes that at the time of the disposition hearing, both Mother and Father were incarcerated, and Kentucky had declined jurisdiction.

*Standard of Review*

Whether jurisdiction exists is a question of law over which this court's scope of review is unlimited. *Fuller v. State*, 303 Kan. 478, 492, 363 P.3d 373 (2015).

9

*Does this court have jurisdiction to hear Mother's appeal?*

Before this court can reach the merits of Mother's argument that the district court lacked subject matter jurisdiction, it must first decide whether it has jurisdiction to hear her appeal. Mother's notice of appeal states that she appealed "from the Ruling rendered and made in the above-entitled action on the 2nd day of August, 2017, whereby it was by said court decided, ordered and adjudged that [Mother's] parental rights should be terminated pursuant to K.S.A. 38-2269." As the State correctly notes, Mother's notice of appeal does not name the August 19, 2016 judgment in which the district court found that Kentucky declined jurisdiction. The State argues this court lacks appellate jurisdiction because Mother did not comply with the statutory mandate to name the judgment she wishes to appeal. "The notice of appeal . . . shall designate the judgment or part thereof appealed from." K.S.A. 2017 Supp. 60-2103(b).

It is worth noting that the district court never entered a written order finding that it had subject matter jurisdiction under the UCCJEA. The closest the district court came to making this finding is its finding that Kentucky had declined jurisdiction. It is thus unclear which order Mother should have named in her notice of appeal to ensure this court would have jurisdiction to review the issue according to the State's argument. But this court need not resolve this issue, as it has appellate jurisdiction either way.

In making its argument, the State relies on the general rules governing appellate jurisdiction. As the State correctly notes, the right to appeal arises not from the United States or Kansas Constitutions but from statute. As a result, Kansas appellate courts generally have jurisdiction to entertain an appeal only if it is taken in the manner prescribed by those statutes. *Wiechman v. Huddleston*, 304 Kan. 80, 86-87, 370 P.3d 1194 (2016). It is a fundamental proposition of Kansas appellate procedure that "'"an appellate court only obtains jurisdiction over the *rulings identified* in the notice of

10

appeal."' [Citations omitted.]" *In re N.U.*, 52 Kan. App. 2d 561, 567, 369 P.3d 984 (2016).

But this issue also implicates the rules on subject matter jurisdiction. Subject matter jurisdiction concerns the court's authority to hear and decide cases. It may be raised at any time, whether for the first time on appeal or even on the appellate court's own motion. *Jahnke v. Blue Cross & Blue Shield of Kansas*, 51 Kan. App. 2d 678, 686, 353 P.3d 455 (2015). Parties cannot confer subject matter jurisdiction by consent, waiver, or estoppel. A failure to object to the court's jurisdiction does not invest the court with the requisite subject matter jurisdiction. See *In re A.A.*, 51 Kan. App. 2d 794, 805, 354 P.3d 1205 (2015).

For support, the State cites *In re N.U.*, 52 Kan. App. 2d at 567-68, in which a panel of this court held that failure to name a district court's ruling on subject matter jurisdiction under the UCCJEA in the notice of appeal deprived this court of jurisdiction to hear any challenge to that ruling. In that case, a father challenged the district court's subject matter jurisdiction under the UCCJEA because a Nebraska court had already entered child custody orders. On January 5, 2015, the district court found that it had temporary emergency jurisdiction under K.S.A. 2015 Supp. 23-37,204(a) and declined to dismiss the case. Father timely appealed that order but later dismissed his appeal.

On July 13, 2015, the district court extended its temporary emergency jurisdiction without first obtaining an order from Nebraska in regards to which state would exercise jurisdiction. Father again appealed. In his notice of appeal, Father stated that he was appealing the district court's order from July 13, 2015, extending temporary emergency jurisdiction. In his brief, however, Father also argued that the court erred in finding it had temporary emergency jurisdiction in its January 5, 2015 order.

11

On appeal, the State argued that this court could not address Father's claim about the January 5, 2015 order because he did not include the transcript from the related hearing. The State also argued this was essentially a second appeal of that order. This court agreed with the State that it could not address Father's claim without a transcript of the related hearing. 52 Kan. App. 2d at 566-67. The court went on to hold that Father's failure to name the January 5, 2015 order in his notice of appeal also deprived it of appellate jurisdiction. 52 Kan. App. 2d at 567-68.

While *In re N.U.* supports the State's position, it does not necessarily control the outcome here. First, the *In re N.U.* court appears to have raised this issue sua sponte, and the record does not show the parties had an opportunity to argue it before the court. Second, the *In re N.U.* court's holding about its appellate jurisdiction is not essential to its decision, so it is arguably dicta. See *Jamerson v. Heimgartner*, 304 Kan. 678, 686, 372 P.3d 1236 (2016). Finally, this court is not bound by the decision of another panel of this court. *State v. Urban*, 291 Kan. 214, 223, 239 P.3d 837 (2010).

Mother did not name the August 19, 2016 order in her notice of appeal. That said, a party cannot waive subject matter jurisdiction. *Jahnke*, 51 Kan. App. 2d at 686. A party may raise a challenge to subject matter jurisdiction at any time before any court. 51 Kan. App. 2d at 686. Parents also have a fundamental constitutional right to custody and control of their children; thus, consideration of Mother's argument for the first time on appeal would be necessary to prevent the denial of a fundamental right. See *In re Estate of Broderick*, 286 Kan. 1071, 1082, 191 P.3d 284 (2008); *In re Guardianship of Williams*, 254 Kan. 814, 819, 869 P.2d 661 (1994). Thus, this court has jurisdiction to hear Mother's argument.

*Did the district court have subject matter jurisdiction?*

As to the merits of Mother's argument, Mother argues that the district court did not properly exercise jurisdiction under the UCCJEA, and even if it did, that jurisdiction expired before the court terminated her parental rights. The Revised Kansas Code for Care of Children (Code), K.S.A. 2017 Supp. 38-2201 et seq., provides that Kansas courts have original jurisdiction over proceedings under the Code, but this jurisdiction is subject to the UCCJEA. K.S.A. 2017 Supp. 38-2203(b). The UCCJEA aims "to avoid jurisdictional competition between the courts of different states over child-custody matters. It does so through rules that generally make sure that only one state at a time has jurisdiction (authority) over child-custody matters in any particular family." *In re A.A.*, 51 Kan. App. 2d at 804. "[A] Kansas district court errs by assuming subject-matter jurisdiction over a child-in-need-of-care case that has interstate connections without making sure that the provisions of the UCCJEA have been satisfied. [Citation omitted.]" *In re A.A.*, 51 Kan. App. 2d at 806. Kentucky has also adopted the UCCJEA. See Ky. Rev. Stat. Ann. § 403.800 et seq.

Here, there are two ways the district court could have acquired jurisdiction over the case: initial child-custody jurisdiction and temporary emergency jurisdiction. While Mother alleged at one point that CPS was trying to take custody of K.L.B. and A.S.B., there is absolutely no evidence of a prior child-custody determination entry in any legal proceeding in the State of Kentucky. Because there was no prior child-custody determination about K.L.B. and A.S.B., the Kansas court could have acquired initial child-custody jurisdiction under K.S.A. 2017 Supp. 23-37,201. That statute provides:

> "(a) Except as otherwise provided in K.S.A. 2017 Supp. 23-37,204, and amendments thereto, a court of this state has jurisdiction to make an initial child-custody determination only if:
> (1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the

13

commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state;

(2) a court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the ground that this state is the more appropriate forum under K.S.A. 2017 Supp. 23-37,207 or 23-37,208, and amendments thereto, and:

(A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence; and

(B) substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under K.S.A. 2017 Supp. 23-37,207 or 23-37,208, and amendments thereto; or

(4) no court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3)." K.S.A. 2017 Supp. 23-37,201.

While there were no prior competing child-custody determinations, the Kansas court did not qualify for initial child-custody jurisdiction. The parties do not dispute that Kentucky, and not Kansas, was the home state of the children. See K.S.A. 2017 Supp. 23-37,102(8) ("'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding."). Kansas lacked jurisdiction on that basis.

Even if the district court did not have initial child-custody jurisdiction, it could have still exercised temporary emergency jurisdiction under K.S.A. 2017 Supp. 23-37,204. That statute provides:

"A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to

14

protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse." K.S.A. 2017 Supp. 23-37,204(a).

In order for a court to exercise temporary emergency jurisdiction, a child must be abandoned or there must be an actual emergency. The UCCJEA defines abandoned as "left without provision for reasonable and necessary care or supervision." K.S.A. 2017 Supp. 23-37,102(1). A panel of this court has defined emergency as "'[a] serious situation or occurrence that happens unexpectedly and demands immediate action.'" *In re A.A.*, 51 Kan. App. 2d at 807 (quoting American Heritage Dictionary 583 [5th ed. 2011]). "[A] child-in-need-of-care finding by itself does not invoke emergency jurisdiction under the UCCJEA." 51 Kan. App. 2d at 807; see also *In re N.U.*, 52 Kan. App. 2d at 568-69.

K.S.A. 2017 Supp. 23-37,204 also addresses how long temporary emergency jurisdiction may last based on whether another state has made a prior child-custody determination. K.S.A. 2017 Supp. 23-37,204(b) provides:

> "If there is no previous child-custody determination that is entitled to be enforced under this act and a child-custody proceeding has not been commenced in a court of a state having jurisdiction under K.S.A. 2017 Supp. 23-37,201 through 23-37,203, and amendments thereto, a child-custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under K.S.A. 2017 Supp. 23-37,201 through 23-37,203, and amendments thereto. If a child-custody proceeding has not been or is not commenced in a court of a state having jurisdiction under K.S.A. 2017 Supp. 23-37,201 through 23-37,203, and amendments thereto, a child-custody determination made under this section becomes a final determination, if it so provides and this state becomes the home state of the child."

Looking at K.S.A. 2017 Supp. 23-37,204, then, there are two questions this court must answer: (1) did the district court properly invoke temporary emergency jurisdiction and (2) did the district court's emergency jurisdiction expire before it terminated Mother's parental rights?

15

As for the first question, Mother argues that the district court failed to find that an emergency existed and that it was exercising temporary emergency jurisdiction. Mother points out that the district court's temporary custody orders do not reference K.S.A. 2017 Supp. 23-37,204 or any type of emergency. Instead, the district court entered only standard orders.

The State responds this court cannot address this claim because Mother has not provided a transcript from the hearing on the temporary custody order. The State asserts that Mother has not cited to where this issue was raised and ruled on in the record. It adds that Mother has the burden to designate a record that establishes error. The State also cites Supreme Court Rule 6.02(a)(4) (2018 Kan. S. Ct. R. 35), which states that litigants must key facts to the record on appeal, and "[t]he court may presume that a factual statement made without a reference to volume and page number has no support in the record on appeal."

The State's point that Mother has failed to designate a record showing error has merit. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013). The district court's written orders granting temporary custody ordered the district attorney's office to contact the appropriate Kentucky court, suggesting the Kansas court was aware of a potential jurisdictional issue. Also, the temporary orders do include the standard finding that the district court has jurisdiction. Thus, the district court may have addressed the UCCJEA at the hearing on the temporary orders and made the necessary findings.

In addition, the undisputed facts show that an emergency existed or the children were abandoned. When the State first took the children into custody, Mother was using methamphetamines while caring for a 14-month-old and a 3-year-old with special needs. Mother left the children under the supervision of a couple she had met the day before and whose last names she did not know. After deputies found Mother, she was hospitalized.

16

Father had already been arrested and extradited to Kentucky, and there were no other family members in Kansas who could care for the children. Mother was arrested a month later, again leaving the children without anyone in Kansas to care for them. Thus, while the record before this court does not definitively show whether the district court made these findings, the record does show that an emergency or abandonment existed, giving the district court emergency jurisdiction under K.S.A. 2017 Supp. 23-37,204.

Mother also makes the claim that the district court's jurisdiction expired before it terminated her parental rights. Mother argues that even if the district court had properly invoked temporary emergency jurisdiction, it never obtained an order from Kentucky declining jurisdiction. Because it did not, Mother claims the district court's jurisdiction expired before it terminated her parental rights. For support, Mother cites *In re N.U.*, 52 Kan. App. 2d at 571-72, in which a panel of this court held that the district court's exercise of temporary emergency jurisdiction expired before it obtained an order from Nebraska relinquishing its initial child-custody jurisdiction.

An important distinction exists between Mother's case and *In re N.U.*, though. In *In re N.U.*, Nebraska had already entered a child-custody determination before the Kansas court exercised emergency jurisdiction. Under those circumstances, K.S.A. 2017 Supp. 23-37,204(c) requires that Kansas courts issuing an order exercising emergency jurisdiction "must specify in the order a period that the court considers adequate to allow the person seeking an order to obtain an order from the state having jurisdiction under K.S.A. 2017 Supp. 23-37,201 through 23-37,203, and amendments thereto." That order "remains in effect until an order is obtained from the other state within the period specified or the period expires." K.S.A. 2017 Supp. 23-37,204(c). In *In re N.U.*, the specified period expired before the Kansas court obtained an order from the Nebraska court, so the Kansas court's emergency jurisdiction ended.

17

In the current case, Kentucky had made no prior child-custody determination about K.L.B. and A.S.B. There were no proceedings in existence in Kentucky addressing child custody or any other matter relating to these children. There were simply no competing proceedings that would require that a jurisdictional determination be made. The record shows that both Mother and Father were incarcerated, and there were no other family members in Kansas to care for the children. In this situation, then, the Kansas court's exercise of jurisdiction would have remained in effect until an order was obtained from Kentucky. K.S.A. 2017 Supp. 23-37,204(b). If, as Mother alleges, Kentucky never entered an order declining jurisdiction, the Kansas court's jurisdiction would have continued and, in fact, could have ripened into home-state jurisdiction. *In re E.T.*, No. 111,971, 2015 WL 1125364, at *7 (Kan. App. 2015) (unpublished opinion) (finding emergency jurisdiction can ripen into home-state jurisdiction under K.S.A. 2013 Supp. 23-37,204[b]).

Mother also appears to argue that the Kentucky court did not enter a valid order because the order was not written. Mother states: "A mere verbal acknowledgement that Kentucky declined jurisdiction should not replace a court order to that effect." Mother cites no authority to support this argument. See *University of Kan. Hosp. Auth. v. Board of Comm'rs of Unified Gov't*, 301 Kan. 993, 1001, 348 P.3d 602 (2015) (holding failure to support a point with pertinent authority is like failing to brief the issue). Nor does Mother provide any explanation beyond this sentence. Thus, Mother has failed to brief this argument adequately, and she has waived and abandoned it. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 889, 259 P.3d 676 (2011). That said, the UCCJEA appears to allow either a written or oral order from a court declining jurisdiction. *In re T.A.B.*, No. 113,609, 2015 WL 8590161, at *3 (Kan. App. 2015) (unpublished opinion).

In sum, the undisputed facts in this case show that the district court had emergency jurisdiction under K.S.A. 2017 Supp. 23-37,204(a) to take the children into custody in July 2016. The district court's emergency jurisdiction then ripened into home-state

18

jurisdiction under K.S.A. 2017 Supp. 23-37,201 at the time of the termination hearing in August 2017. Kentucky declined to assume jurisdiction over the case, and Mother has not produced any competing custody orders from another state. See *In re E.T.*, 2015 WL 1125364, at *8 (finding district court properly exercised emergency jurisdiction and that emergency jurisdiction ripened into home-state jurisdiction by time of CINC trial).

## DID THE DISTRICT COURT ERR IN FINDING MOTHER UNFIT AND THIS CONDITION WAS UNLIKELY TO CHANGE IN THE FORESEEABLE FUTURE?

Mother argues that substantial competent evidence does not support the district court's finding that she was unfit and would remain that way for the foreseeable future. Mother contends the district court ignored evidence of her progress. Mother also asserts the district court placed too much emphasis on the quality of K.L.B. and A.S.B.'s foster home.

The State responds that the evidence does support the district court's findings. While Mother testified she had made progress, the State points out that the district court found she was not credible. The State also contends Mother had failed to show she could maintain stability outside of a restrictive environment at the time of termination.

*Standard of Review*

The Kansas Legislature has specified that the State must prove "by clear and convincing evidence that the child is a [CINC]." K.S.A. 2017 Supp. 38-2250. In addition to CINC adjudications, the clear and convincing evidence standard of proof applies to all termination of parental rights cases. K.S.A. 2017 Supp. 38-2269(a).

> "When this court reviews a district court's termination of parental rights, we
> consider whether, after review of all the evidence, viewed in the light most favorable to
> the State, we are convinced that a rational factfinder could have found it highly probable,

19

> *i.e.* by clear and convincing evidence, that the parent's rights should be terminated. [Citation omitted.]" *In re K.W.*, 45 Kan. App. 2d 353, 354, 246 P.3d 1021 (2011).

In making this determination, an appellate court does not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008).

The Code provides that the district court may terminate parental rights upon certain findings after a child has been adjudicated a CINC. K.S.A. 2017 Supp. 38-2269(a). The statute lists nonexclusive factors the court must consider in determining unfitness. K.S.A. 2017 Supp. 38-2269(b). The district court must also consider a separate list of nonexclusive factors when a child is not in the parent's physical custody. K.S.A. 2017 Supp. 38-2269(c). In addition, the district court may apply one or more of 13 statutory presumptions of unfitness outlined in K.S.A. 2017 Supp. 38-2271.

*Finding of Unfitness*

A review of the record, in the light most favorable to the State, shows there was clear and convincing evidence supporting the district court's finding that Mother was unfit under these factors:

- K.S.A. 2017 Supp. 38-2269(b)(3): "the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child." Mother began using methamphetamines and pain pills several months before her children went into State custody. Mother also admitted to doing methamphetamines while the children were in her care. While Mother had been sober for 13 months, she had also spent that time either in jail or in rehab.

20

- K.S.A. 2017 Supp. 38-2269(b)(5): "conviction of a felony and imprisonment." Mother does not dispute that she has a felony theft conviction and that she spent a significant period in jail during the pendency of this case.

- K.S.A. 2017 Supp. 38-2269(b)(7): "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." Somers' testimony showed she made notable efforts to help Mother in completing her case plan tasks. Because of Mother's incarceration and time in a rehabilitation center, Mother could not successfully complete those tasks.

- K.S.A. 2017 Supp. 38-2269(b)(8): "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." Mother testified that she had been sober for several months and had generally made progress toward reintegrating with her children. But the district court found that Mother's testimony was not credible because her statements contained several inconsistencies. The district court also found that while Mother said she would be willing to do what she needed to help K.L.B. continue to develop, Mother had not made any realistic efforts to develop these skills.

- K.S.A. 2017 Supp. 38-2269(c)(3): "failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home." At the time of the termination hearing, Mother had not completed her case plan tasks. Mother had not met her obligations arising from her criminal charges. And because Mother had been incarcerated and was currently in a rehab center, she had not found employment or housing, or shown she could maintain sobriety without supervision.

Clear and convincing evidence must also support the district court's finding that the conduct or condition rendering Mother unfit is unlikely to change in the foreseeable future. K.S.A. 2017 Supp. 38-2269(a). This court examines the term "foreseeable future"

21

from the perspective of a child. *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014). Children and adults have different perceptions of time, and a child has the right to permanency within a time frame that is reasonable to them. 50 Kan. App. 2d at 1170. A district court may look to a parent's past conduct as an indicator of future behavior. See *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982); *In re M.T.S.*, No. 112,776, 2015 WL 2343435, at *8 (Kan. App. 2015) (unpublished opinion) ("Parental unfitness can be judicially predicted from a parent's past history.").

Mother and Somers both testified that Mother could complete her rehab program in a few months. Somers also testified that Mother would need to maintain sobriety, employment, and housing for at least another six to nine months once she was released. Even then, Somers would not be confident reintegrating the children for at least a year or two because of K.L.B.'s special needs. Given the young age of the children and the time they had already spent in State custody, substantial competent evidence supports the district court's ruling that Mother would not become fit in the foreseeable future.

In her brief, Mother argues that her failure to complete all her case plan tasks does not support the district court's findings. Mother highlights that she testified she made as much progress as she could, given her legal situation. Mother also contends that the State offered no evidence to counter her testimony about her progress and her future intentions. As noted above, though, the district court found that Mother was not credible. And this court does not pass on the credibility of witnesses under its standard of review.

Mother also argues that her incarceration and time in rehabilitation prevented her from completing her case plan tasks. But district courts do not have to treat incarceration as a mitigating factor. See *In re M.D.S.*, 16 Kan. App. 2d 505, 510-11, 825 P.2d 1155 (1992). Here, the district court chose to treat Mother's legal situation as a negative factor. The record supports this determination. First, imprisonment for a felony alone can result in termination. K.S.A. 2017 Supp. 38-2269(b)(5). K.L.B. and A.S.B. were also very

22

young when they entered State custody, and K.L.B. had special needs. Delaying proceedings to allow Mother to complete her legal obligations would not serve the best interests of the children, which is a paramount concern in proceedings under the Code. See K.S.A. 2017 Supp. 38-2201(b)(1), (b)(3), and (b)(4).

Finally, Mother contends the district court improperly considered the quality of the children's foster home in reaching its decision. Mother asserts that the "district court believed the foster family to be superior to Mother and then subsequently ignored all the evidence regarding Mother's progress in order to justify keeping the [c]hildren in that home." Mother argues that a court cannot terminate parental rights based only on the best interests of the child because it violates the parental preference doctrine. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 435-36, 242 P.3d 1168 (2010).

The district court did praise the foster family in its ruling from the bench. And it did take the unconventional step of starting with its best interests determination in that ruling. Regardless, the district court referenced the appropriate legal standards for its fitness findings and made extensive findings on the record. Thus, the record does not show that the district court terminated Mother's parental rights simply because it found the foster family would provide a better home.

*Best interests determination*

Finally, the district court found it was in the best interests of the children to terminate Mother's parental rights. Mother does not challenge this finding on appeal, so she has waived and abandoned any argument on this issue. *Kimball*, 292 Kan. at 889. In all events, a review of the record reveals the district court did not abuse its discretion in making this finding. See *In re K.P.*, 44 Kan. App. 2d 316, 318, 235 P.3d 1255 (2010) (best interests finding reviewed for abuse of discretion).

Affirmed.

23