NOT DESIGNATED FOR PUBLICATION

No. 124,019

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of S.R. and R.R.,
Minor Children.

MEMORANDUM OPINION

Appeal from Rice District Court; CAREY L. HIPP, judge. Opinion filed December 3, 2021.
Affirmed.

*Shannon S. Crane*, of Hutchinson, for appellant.

*Remington S. Dalke*, county attorney, for appellee.

Before GREEN, P.J., MALONE and ISHERWOOD, JJ.

PER CURIAM:  S.R. Sr. (Father) appeals the district court's judgment terminating his parental rights over his two children, S.R. and R.R. (collectively, the Children). Mother relinquished her rights and does not appeal. Father claims the district court erred in finding he was unfit and that his unfitness was unlikely to change in the foreseeable future. He also argues that termination was not in the Children's best interests. After thoroughly reviewing the briefs and the record on appeal, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In November 2018, S.R., born in 2018, and R.R., born in 2016, were living in Butler County with Mother, Father, and their three half-siblings. Half-siblings are not Father's children. On November 14, 2018, one of the half-siblings, 16-year-old D.T.,

1

disclosed to her school that when she came home from school the day before, R.R. was taking a bath and her butt was red. D.T. said that R.R. told her that "'daddy fucked [her] butt.'" D.T. also reported seeing bruising on one of her other siblings. D.T. also stated that Father punched Mother in the stomach while Mother was pregnant with R.R. and that Mother and Father fought four or five times a week.

After interviewing R.R., who did not disclose any sexual abuse, Department for Children and Families (DCF) believed that R.R. may have been referring to having been spanked by Father. DCF also interviewed the stepchild with the bruise, who reported that Father caused the bruise and that he was afraid of Father. The stepchild stated that he had seen Father push, punch, and kick Mother. DCF called police to have the Children placed in protective custody. When law enforcement arrived at the house, they smelled marijuana, saw two glass smoking devices, and a small clear baggie. Father admitted that he had smoked marijuana earlier in the morning.

On November 19, 2018, the State filed separate petitions in Butler District Court asking that S.R. and R.R. each be deemed a child in need of care (CINCs). The petitions asserted the Children were without adequate parental care because of alleged domestic violence between Mother and Father, reports of Father being abusive towards at least some of the children in his home, evidence that Father is using marijuana in the home, and leaving marijuana and drug paraphernalia in the home.

The next day, the district court entered a temporary custody order, placing the Children in DCF custody. St. Francis Ministries (St. Francis) provided services. The district court found that because Mother was a member of the Cheyenne River Sioux Tribe, the Indian Child Welfare Act (ICWA) applied to the case.

On December 6, 2018, both parents met with St. Francis for a case plan meeting. The case manager was unable to discuss all the components of the case plan because

2

Father became "'quite angry during the meeting [and] cussed throughout the case plan.'" A few days later, a caseworker conducted a home visit at the parents' house. The conversation began normally but deteriorated into Mother and Father arguing about whose fault it was that the Children were removed. Father got "'very angry'" and stated, "'[H]e w[ould] sign the [expletive] kids away.'" The caseworker decided to end the visit.

On January 2, 2019, Father took the batterers intervention program assessment. Father did not complete the assessment because he did not want to answer the questions and he was "'combative and non-cooperative.'" The assessment recommended that Father take a 26-week class. St. Francis offered to pay half of the cost, and Father was "'very upset at the idea of paying for half of this class [because] finances are a struggle for them.'" But after further reflection, Father stated that he understood the need for the class and he would come up with the money.

On March 7, 2019, Father went to his batterers intervention program orientation, but he had to "'wait too long'" before being seen so he left. On March 14, 2019, Father again showed up for the orientation. Father did not let the caseworker explain the program. The caseworker told Father to stop talking and to listen, but Father then became upset stating he did not have to attend the program. Because of this incident, the batterers intervention program discharged Father and he was not allowed to return.

On March 18, 2019, Mother and Father were both arrested on outstanding warrants. St. Francis visited Father in jail and told him about a rescue program that could help provide him with housing. Father stated he would not go there because he claimed that only African Americans went to that mission for help.

On March 27, 2019, the district court issued the adjudication and disposition order, finding S.R. and R.R. to be CINCs based on the parents' stipulation. The district court ordered Father to complete the 24-week batterers intervention program and ordered

him to be out of the home so the Children could be placed back with Mother. The district court issued a restraining order against Father for the Children and Mother.

On May 9, 2019, Father called St. Francis, stating he was at the house picking up his belongings and he wanted St. Francis to pay for his batterers intervention program. Father began yelling at the St. Francis caseworker and did not give the caseworker a chance to respond. The caseworker finally asked Father the address of where he would be staying so a visit could be scheduled. Father refused to give an address and told the caseworker that it was not "'important'" for St. Francis to know where he was staying.

On May 10, 2019, Father called another St. Francis caseworker from Mother's phone and was "'very angry'" because St. Francis had given him the wrong address and phone number for counseling services. The caseworker gave him the correct information and could hear Mother in the background. Father continued to "'cuss the worker out'" and finally hung up. He then called back three times, but the caseworker refused to answer.

On June 13, 2019, the district court held a review hearing. The district court kept the no contact order with Mother in place until Father made progress in the batterers intervention program. The district court lifted the no contact order between Father and the Children for visitation. The district court also ordered the parents to submit to UAs.

On September 12, 2019, the district court held another review hearing. The district court noted the parents had moved to Lyons, Kansas, and they were living together in violation of the no contact order. The district court also noted Father had not completed the batterers intervention program. The district court directed the State to file contempt paperwork based on the violation of the no contact order and denied any request to lift the no contact order. The State filed contempt accusations against both parents.

On November 19, 2019, the district court held a permanency hearing and continued all previous orders, noting that Mother and Father continued to live together despite the no contact order. Sometime during December 2019 Father moved to Texas.

On January 13, 2020, the district court granted the State's motion for a change of venue from Butler County to Rice County because of the family's move to Lyons, Kansas. Candice Hirsch, a permanency specialist at St. Francis, received Father's case after it was transferred from Butler County to Rice County. Hirsch noted that Father's whereabouts were unknown when she received the case. Hirsch contacted Mother, but Mother told Hirsch that she did not know Father's location.

In July 2020, Hirsch received a phone number for Father and called him. Hirsch informed Father of the case tasks he needed to complete for reintegration. The tasks included submitting to UAs and hair follicle testing, obtaining and maintaining adequate housing, providing proof of housing, and providing proof of working utilities. Father was also given St. Francis' contact information. Hirsch reported there was a lot of "cussing and yelling" during the phone call and it was cut short because Father became so upset.

On July 14, 2020, the district court held another permanency hearing, leaving all previous orders in effect. The next month, Father's attorney moved to withdraw from the case. Counsel reported that Father was "extremely confrontational and exceedingly difficult to communicate with." Counsel explained that Father called his office and his staff tried to schedule a meeting so Father could talk to counsel, but Father yelled and cursed at his staff. Father also yelled at his counsel and told him to withdraw from the case. The district court later appointed another attorney to represent Father.

At a permanency hearing on August 28, 2020, the district court found reintegration was no longer a viable goal. The district court changed the case plan goal to adoption and ceased the parents' visitation with the Children.

On October 2, 2020, the State moved for a finding of unfitness and termination of parental rights. At a hearing on November 24, 2020, Mother relinquished her parental rights. Father refused to relinquish his rights and requested an evidentiary hearing.

On February 11, 2021, the district court held a termination hearing for Father's parental rights. Hirsch testified and summarized the case tasks Father needed to complete for reintegration. Hirsch testified that Father had made no progress on any of the case plan tasks assigned to him. She also testified that Father had no visits with the Children since the case was transferred to Rice County. Hirsch testified that she did not believe there was any chance in the foreseeable future of Father working a case plan.

The State also called Chelsey LeCompte, a case manager for the Cheyenne River Sioux Tribe and a qualified expert witness. LeCompte testified that she reviewed the file and believed the State had made active efforts to reintegrate the Children with the parents. She testified she believed the Children would suffer emotional or physical damage if Father had custody. LeCompte did not believe the Tribe would be impacted negatively if Father's rights were terminated.

Father testified on his own behalf by video. Father explained that he had been in prison shortly before D.T. made her allegations. Father said there was "friction between" him and D.T. because when he returned from prison, he had told D.T. she could not sneak out and could not do drugs. Father claimed that he told D.T. that if she wanted to mess with him that she needed to bring her "A game." The next day she went to her school and made the allegations.

Father also testified that the restraining order was issued because his lawyer and St. Francis told them that if Mother got the order, the Children could return home with her. Father claimed the caseworker told them that provided they were not fighting or

6

abusing each other, then St. Francis would "look the other way" concerning the violation of the no contact order.

Father also testified that after he moved to Texas, he called St. Francis but he could never get a hold of anyone. Father said he eventually got a hold of the caseworker but the conversation "got a little personal. And things went south real quick." Father says that the caseworker told him that she would do everything in her power to make sure he did not get the Children back. Father testified that he now lives with his mother and 13-year-old daughter and that he is working.

On cross-examination, Father was asked if he knew he had an active warrant in Kansas and if that was why he did not attend any hearings. Father said he did not come to the hearings because the caseworker had told him she would do everything in her power to take his children away "[s]o why go . . . [and] it was never mandatory that [he] show up." Father also said that although he could pay for a batterers intervention program, St. Francis told him there was no reason for him to do it because they planned to terminate his rights.

Father stated that he never provided proof of income or housing even though it was on his case plan because no one ever asked him to provide the information or told him where to send it. Father also explained to the caseworker that he was living with his mom and the utilities were in his dad's name but that the caseworker had said that she would take his rights away, so he never sent her the proof.

On February 23, 2021, the district court issued a memorandum decision. The district court found clear and convincing evidence that Father was presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6). The district court pointed out that Father was ultimately discharged from the batterers intervention program because he was combative and non-cooperative. The district court also found Father's testimony to be

7

contradicted by other sources on "nearly all important issues." The district court noted that once venue was transferred to Rice County, all contact with Father by St. Francis "was negative," ending when Father became belligerent or aggressive.

The district court took judicial notice of Father's previous counsel withdrawing because of Father's non-cooperation and his rude manner towards counsel and his staff. The district court also found Father "made no progress on his case plan goals the entire time the case has been in Rice County." More specifically, Father failed to have visits for about 14 months, moved to Texas, failed to complete the batterers intervention program, failed to provide proof of income and housing, and failed to complete UA's other than the one that was positive in 2019. The district court also found that even if the State were not entitled to a presumption of unfitness, the State had presented clear and convincing evidence to justify termination under K.S.A. 2020 Supp. 38-2269.

The district court also found clear and convincing evidence that Father's conduct or condition was unlikely to change in the foreseeable future because Father is living in Texas and even though Father claimed he had changed his ways in the past year, he had made no progress on the case plan goals. Finally, the district court found termination of Father's parental rights to be in the best interests of the Children because they have been in out of home placement for 27 months, and because of their young age, the time they spent out of the home represented a large portion of their lives.

On March 8, 2021, the district court issued a journal entry terminating Father's parental rights, referencing its February 23, 2021, memorandum decision. Father timely appealed the district court's judgment.

8

## DID THE DISTRICT COURT ERR IN TERMINATING FATHER'S PARENTAL RIGHTS?

On appeal, Father claims the district court erred in finding he was unfit and that his unfitness was unlikely to change in the foreseeable future. He also argues that termination of his parental rights was not in the Children's best interests. The State responds that the district court properly terminated Father's parental rights.

> "'When this court reviews a district court's termination of parental rights, we consider whether, after review of all the evidence, viewed in the light most favorable to the State, we are convinced that a rational factfinder could have found it highly probable, *i.e.*, by clear and convincing evidence, that the parent's rights should be terminated. [Citation omitted.]'" *In re K.L.B.*, 56 Kan. App. 2d 429, 445, 431 P.3d 883 (2018).

In doing so, this court does not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. 56 Kan. App. 2d at 445.

A parent has a fundamental liberty interest in the right to decide the care, custody, and control of the parent's child. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). But a parent's constitutional rights are not without limits. *In re A.A.-F.*, 310 Kan. 125, 146, 444 P.3d 938 (2019). Generally, the Revised Kansas Code for Care of Children (Revised Code), K.S.A. 2020 Supp. 38-2201 et seq., governs the termination of parental rights. But if "an Indian child is involved in the proceeding . . . the Indian child welfare act of 1978 [(ICWA)], 25 U.S.C. § 1901 et seq., applies." K.S.A. 2020 Supp. 38-2203(a); *In re M.F.*, 290 Kan. 142, 148-49, 225 P.3d 1177 (2010). While ICWA applies to this case, this court has established that "as a 'practical' matter" the test for termination under state law, the Revised Code, can be applied before applying the standard from ICWA. *In re A.P.*, 25 Kan. App. 2d 268, 277-78, 961 P.2d 706 (1998); *In re S.M.P., Jr.*, No. 108,209, 2012 WL 6734666, *3 (Kan. App. 2012) (unpublished opinion). Father makes no claim that the provisions and standards of ICWA were not properly applied in this case.

Under the Revised Code:

> "When the child has been adjudicated to be a child in need of care, the court may terminate parental rights . . . when the court finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a).

To determine whether a parent is unfit, the district court "shall consider, but is not limited to," statutory factors set forth in K.S.A. 2020 Supp. 38-2269(b) and (c). And it is presumed that a parent is unfit if the State establishes certain conditions, enumerated in K.S.A. 2020 Supp. 38-2771(a), by clear and convincing evidence.

The district court found Father presumptively unfit because (1) the Children had been in an out-of-home placement, under court order for a cumulative total period of one year or longer and Father has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the Children into the parental home; and (2) the Children had been in an out-of-home placement, under court order for a cumulative total period of two years or longer, Fathers failure to carry out a reasonable plan, approved by the court, directed toward reintegration of the Children into the parental home, and there was a substantial probability that Father would not carry out such plan in the near future. See K.S.A. 2020 Supp. 38-2771(a)(5), and (a)(6). The district court found that the State presented clear and convincing evidence to invoke the presumptions and Father did not rebut the presumption of unfitness. See K.S.A. 2020 Supp. 38-2771(b).

On appeal, Father asserts that the district court erred in finding him unfit. But Father's brief consists almost entirely of recitation of the governing law. His legal argument is brief, spanning only one and a half pages. He asserts that the district court erred in terminating his parental rights but then points to only one factor, K.S.A. 2020

Supp. 38-2269(b)(7), and argues that because St. Francis workers failed to maintain contact with him, the agency did not provide reasonable efforts to help Father reintegrate with the Children. The State counters that S.R. and R.R. were out of the home for over two years and Father did not complete even one court approved task, thus, the court correctly found that Father was unfit, and his unfitness was unlikely to change in the foreseeable future.

Although Father's brief cites K.S.A. 2020 Supp. 38-2269(b)(7), the district court made no specific findings under this subsection in terminating Father's parental rights. Instead, the district court found Father presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6). Thus, we will address whether clear and convincing evidence supports the district court's findings of unfitness under those subsections.

*Clear and convincing evidence supports finding Father presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6).*

Father's challenge on appeal fails to challenge the main reasons cited by the district court for terminating his parental rights. The district court explicitly found "clear and convincing evidence that [F]ather is unfit by reason of conduct or condition which renders [F]ather unable to fully care for both children under K.S.A. [2020 Supp.] 38-2271(a)(5) and (a)(6)." When a district court provides alternative bases to support its ultimate ruling on an issue and an appellant fails to challenge the validity of both alternative bases on appeal, an appellate court may decline to address the appellant's challenge to the district court's ruling. *National Bank of Andover v. Kansas Bankers Surety Co.*, 290 Kan. 247, 280, 225 P.3d 707 (2010); *In re D.E.*, No. 120,244, 2019 WL 1412432, *4 (Kan. App. 2019) (unpublished opinion) (citing rule and pointing out that because Father failed to challenge the presumption of unfitness relied on by the district court, the appellate court could decline to hear his argument). Because Father failed to challenge the presumptions of unfitness, we could decline to address his challenge to the

finding of his unfitness. But even assuming Father has challenged the presumptions, there is clear and convincing evidence to support finding Father unfit under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6).

K.S.A. 2020 Supp. 38-2271(a)(5) requires that

"the child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home."

Taking the evidence in the light most favorable to the State, there is clear and convincing evidence that Father substantially neglected or willfully refused to carry out a reasonable plan toward reintegration. Children were removed from the home in November 2018, and thus had been out of the home for 27 months at the time of the termination hearing. Father's anger and aggression often led to meetings, home visits, or phone calls being terminated early before progress could be made. Similarly, Father failed to complete a batterers intervention program, a case plan goal.

Father also failed to abide by the district court's no contact order by living with Mother after the order was entered. Father then moved to Texas while his pending case plan tasks required submitting to UAs and hair follicle testing, obtaining and maintaining adequate housing, providing proof of housing, and providing proof of working utilities. Father did not participate in any of these case plan tasks while he was in Texas. Father admitted he did not provide proof of income or housing, claiming he felt he did not need to since the caseworker had informed him that she would take his rights away. In sum, there is clear and convincing evidence to support finding Father presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(5).

Next, K.S.A. 2020 Supp. 38-2271(a)(6) requires that the child be out of home for at least two years and "the parent has failed to carry out a reasonable plan, approved by the court, directed toward reintegration of the child into the parental home; and . . . there is a substantial probability that the parent will not carry out such plan in the near future." As discussed above, there is clear and convincing evidence that the Children were out of the home for at least two years and Father failed to carry out a reasonable plan directed toward reintegration. And there is clear and convincing evidence to support that there was a substantial probability that Father would not carry out such a plan in the future. The district court can consider Father's past history as evidence regarding the reasonable likelihood of any future change in his parental fitness. *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 944 (2019).

The district court found clear and convincing evidence that Father's conduct or condition was unlikely to change in the foreseeable future because Father was living in Texas and even though Father claimed he had changed his ways in the past year, he had made no progress on the case plan goals. Father had two years to complete case plan goals and did not complete any of them. He also continued to have aggression and anger issues that he never addressed, despite several opportunities to do so. Father admitted giving up on trying to complete the plan before the termination hearing. For instance, Father said he did not come to recent hearings because the caseworker had told him she would do everything in her power to take his children away "[s]o why go . . . [and] it was never mandatory that [he] show up." Father stated the same thing when asked about his failure to send proof of housing and utilities. Thus, there is clear and convincing evidence to support finding Father presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(6).

In sum, the district court did not err in finding Father unfit and that his unfitness was unlikely to change in the foreseeable future. The district court properly found Father presumptively unfit under K.S.A. 2020 Supp. 38-2271(a)(5) and (a)(6) and Father did not rebut that presumption, nor did he challenge those findings on appeal. Further, Father's

13

only challenge on appeal is whether St. Francis provided reasonable efforts to rehabilitate the family. The record established, by clear and convincing evidence, that St. Francis provided reasonable efforts, but Father failed to take advantage of those efforts.

Finally, because this case is governed by ICWA, termination cannot be ordered "in the absence of a determination, supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f) (2018). Father does not acknowledge that ICWA applied or challenge the termination on this basis. That said, LeCompte, a qualified expert witness, testified that Father's continued custody would likely result in serious emotional or physical damage to the Children. Additionally, she testified that the "active efforts" toward reintegration required under ICWA were provided but refused by Father. See 25 U.S.C. § 1912(d). Thus, termination was proper under ICWA.

*The district court did not abuse its discretion in determining termination was in the Children's best interests.*

Upon making a finding of unfitness of the parent, "the court shall consider whether termination of parental rights as requested in the petition or motion is in the best interests of the child." K.S.A. 2020 Supp. 38-2269(g)(1). In making such a decision, the court shall give primary consideration to the physical, mental, and emotional needs of the child. K.S.A. 2020 Supp. 38-2269(g)(1).

Father asserts that "it was clear" that he had a strong bond with the Children—evidenced by his driving to pick the Children up for a visit—and thus termination was not in the Children's best interests. The State counters that the district court did not abuse its discretion in finding termination to be in the Children's best interests because the Children had spent most of their lives without Father.

14

This court reviews a district court's determination of the best interests of a child based on a preponderance of evidence for an abuse of discretion. An abuse of discretion occurs if (1) no reasonable person would agree with the district court; (2) the decision is based on an error of law; (3) the decision is based on an error of fact. *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014).

Father does not assert that the district court made an error of law or fact. Instead, he seems to be arguing that termination was unreasonable because of his bond with the Children. There is no evidence that the Children were bonded with Father, but, even so, simply because Father has a bond with the Children does not mean that termination was not in the Children's best interests. The district court properly considered the physical, mental, and emotional health of the Children and pointed out that the Children had been out of the home for 27 months. The district court explained that S.R. was removed when he was four months old and thus spent most his life out of Father's care. Similarly, R.R. spent almost half of her life out of Father's care. The district court also pointed out that Father had failed to have visits with the Children for about 14 months. Considering this evidence, the district court did not abuse its discretion in finding that termination of Father's parental rights was in the Children's best interests.

Affirmed.