IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 110,977

JAMES LEE JAMERSON,
*Appellant*,

v.

JAMES HEIMGARTNER, WARDEN,
EL DORADO CORRECTIONAL FACILITY,
*Appellee.*

SYLLABUS BY THE COURT

1.

Courts generally give penal authorities great deference in the management and operation of the prison system.

2.

A mere change in the level of an inmate's security classification within a prison does not constitute such a deprivation of a liberty interest that it will support a legal challenge by a prisoner.

3.

Although they are confined to prison, inmates retain certain constitutionally protected liberty interests to which the right of due process applies.

4.

Prison authorities may infringe on a protected liberty interest when they impose a restraint on a prisoner's already quite-limited freedom and the restraint is atypical and a significant hardship on the inmate in relation to the ordinary incidents of prison life.

1

5.

The duration of segregated placement is a factor that courts must consider in determining whether an inmate has demonstrated a liberty interest infraction. Duration must be considered together with other factors, such as the frequency of visitation, access to exercise or work programs, the degree of supervision, and how those conditions compare with the conditions of inmates in the general prison population. In extreme cases, duration may be the dominant factor for consideration.

6.

Judicial dictum is an expression of opinion on a question directly involved in a particular case that was argued by counsel and deliberately ruled on by the court.

7.

Judicial dictum, while not essential to a decision, must be given considerable weight and provides guidance to lower courts.

Review of the judgment of the Court of Appeals in an unpublished opinion filed June 20, 2014. Appeal from Butler District Court; JOHN E. SANDERS, judge. Opinion filed June 17, 2016. Appeal is moot. Question taken on review is discussed and answered.

*Nancy Ogle*, of Ogle Law Office, L.L.C., of Wichita, argued the cause and was on the briefs for appellant.

*James Lee Jamerson*, appellant, filed a brief pro se.

*Michael J. Smith*, of Kansas Department of Corrections, of El Dorado, argued the cause and was on the briefs for appellee.

*Stephen Douglas Bonney*, of ACLU Foundation of Kansas, of Kansas City, Missouri, was on the brief for *amicus curiae* American Civil Liberties Union Foundation of Kansas.

The opinion of the court was delivered by

ROSEN, J.: James L. Jamerson appeals from the denial by the district court of his petition for a writ of habeas corpus, in which he challenged the basis for his confinement in administrative segregation. The Court of Appeals affirmed the judgment of the district court. In granting review, this court directed the parties to brief an issue not explicitly argued to the Court of Appeals relating to the constitutionality of Jamerson's confinement: the duration of his administrative segregation.

Jamerson is serving a sentence of 288 months following his plea of no contest to charges of second-degree intentional murder, aggravated robbery, and conspiracy to commit aggravated robbery, all leading from events occurring in Shawnee County in January 2001. His conviction and sentenced were affirmed on appeal. *State v. Jamerson*, No. 89,382, 2003 WL 22345443 (Kan. App.) (unpublished opinion), *rev. denied* 277 Kan. 926 (2003).

In June 2010, in response to threats of gang violence and possible involvement in contraband trafficking, Jamerson was placed in administrative segregation at Lansing Correctional Facility. More than 3 years later, on August 8, 2013, he filed a petition for writ of habeas corpus under K.S.A. 60-1501. He alleged that he had been placed in administrative custody based on false reports and for other unlawful reasons and that his continued administrative custody, already lasting over 1000 days, therefore violated his constitutional right to due process. Without conducting a hearing, the district court dismissed the petition for three reasons: he failed to seek timely administrative relief,

placement in administrative segregation does not implicate constitutional rights, and classification and placement issues are best left to penal authorities.

The Court of Appeals rejected the conclusion that Jamerson had failed to exhaust his administrative remedies properly but agreed with the district court that continued incarceration in segregated custody, without at least a prima facie showing of unusually harsh conditions, does not infringe on a protected liberty interest. *Jamerson v. Heimgartner*, No. 110,977, 2014 WL 2871439 (Kan. App. 2014) (unpublished opinion).

Jamerson filed a pro se petition for review along with his attorney's separate petition for review. This court granted the pro se petition in part. The court informed the parties that the sole issue that the court would consider is the question of whether the duration of administrative segregation alone implicates an inmate's due process liberty interest, an issue not explicitly argued in either the district court or the Court of Appeals. The parties were directed to provide supplemental briefing limited to this issue.

It is acknowledged by both parties that Jamerson is no longer placed in administrative segregation, having successfully completed a behavior modification program. Although a decision on the question presented to the parties will not have an immediate impact on his cause of action, which sought release from such segregated placement, the issue is one of statewide interest and of a nature that demands a decision, and the circumstances generating the issue will likely arise repeatedly. We therefore elect to set out certain contours for evaluating claims of constitutional liberty interests in the context of extended administrative segregation. See *State v. Hollister*, 300 Kan. 458, 458-59, 329 P.3d 1220 (2014) (setting out conditions for addressing issues not currently affecting rights of parties).

4

Segregation, or solitary confinement, generally consists of restricting contact among prisoners, between prisoners and prison staff, and between prisoners and visitors for extended periods of time. Disciplinary segregation is instituted for punitive reasons and restricts an inmate's privileges and rights in order to maintain discipline in correctional facilities. The purpose of disciplinary segregation is punishment, and placement in disciplinary segregation requires compliance with correctional regulations. *Amos v. Nelson*, 260 Kan. 652, 656, 923 P.2d 1014 (1996). Unlike disciplinary detention, administrative segregation is nonpunitive. *Amos*, 260 Kan. at 657. Administrative segregation is used as a method for physically segregating from the general population those prisoners who, for certain reasons, cannot be placed in the general prison population. *Rimmer-Bey v. Brown*, 62 F.3d 789, 790 n.2 (6th Cir.1995).

A curious result of the distinction is that *punitive* segregation is generally of a short duration, while *administrative* segregation may extend for periods of years, or even decades. A correctional classification that is so harsh that it is used as punishment on some inmates may thus be imposed for longer periods of time on inmates who have not been designated for punitive treatment. Although courts may seek to distinguish between the rights involved in the two different motivations for segregating prisoners, the label used may encourage a "standardless discretion" that may violate due process. See *McClary v. Kelly*, 4 F. Supp. 2d 195, 199 (W.D.N.Y. 1998).

Courts give penal authorities great deference in the management and operation of the prison system. See *Meachum v. Fano*, 427 U.S. 215, 224, 96 S. Ct. 2532, 49 L. Ed. 2d 451 (1976); *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974); *Schuyler v. Roberts*, 285 Kan. 677, 681, 175 P.3d 259 (2008); *Foster v. Maynard*, 222 Kan. 506, 509, 565 P.2d 285 (1977); *Chambers v. Colorado Dept. of Corrections*, 205 F.3d 1237, 1242 (10th Cir. 2000).

5

Nevertheless, although they are confined to prison, inmates retain certain constitutionally protected liberty interests whose deprivation implicates the right to due process. See *Wolff*, 418 U.S. at 557; *Schuyler*, 285 Kan. at 681; *Chambers*, 205 F.3d at 1242. To be sure, incarcerated persons retain only a narrow range of protected liberty interests. See *Rezaq v. Nalley*, 677 F.3d 1001, 1011 (10th Cir. 2012). A protected liberty interest may, however, arise when prison authorities impose a restraint on a prisoner's already quite-limited freedom and the restraint is atypical and a significant hardship on the inmate in relation to the ordinary incidents of prison life. See *Sandin v. Conner*, 515 U.S. 472, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995).

Here, the district court denied the petition for relief in part because classification and placement issues do not raise constitutional issues. While this conclusion is in a broad sense correct, it provides an incomplete understanding of an inmate's liberty interests with respect to segregated confinement. As a constitutional question distinct from procedural due process and separate from cruel and unusual punishment, courts have given credence to claims that confinement in segregated custody may encroach on protected liberty interests.

In *Hewitt v. Helms*, 459 U.S. 460, 468, 103 S. Ct. 864, 74 L. Ed. 2d 675 (1983), the Supreme Court held that a prisoner has no constitutional right to remain free of discretionary administrative segregation because "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence." The Court determined that the Due Process Clause, standing alone, did not confer a liberty interest in avoiding administrative segregation; there was no constitutional liberty interest in freedom from state action taken "within the sentence imposed." 459 U.S. at 468. The Court recognized that prisoners retain only "the most basic liberty interests" and determined that remaining in the general population was not one of those basic interests, explaining that, because

"inmates should reasonably anticipate receiving [administrative segregation] at some point in their incarceration," the Due Process Clause alone does not create a liberty interest. 459 U.S. at 468-69.

Subsequently, in *Sandin*, 515 U.S. at 485, the Supreme Court held that a mere change in the level of an inmate's security classification within a prison does not constitute such a deprivation of a liberty interest that it will support a legal challenge by a prisoner. The Court went on to hold that disciplinary segregation was not an atypical and significant hardship in relation to ordinary incidents of prison life because such discipline is similar to conditions experienced by inmates in administrative segregation and protective custody. 515 U.S. at 485-86.

Kansas court decisions have been consistent with these decisions. In *Murphy v. Nelson*, 260 Kan. 589, 602, 921 P.2d 225 (1996), the court relied on *Sandin* to conclude that the administrative regulations in effect at the time in Kansas governing correctional segregation did not, as a matter of law, create conditions during administrative segregation leading to a significant and atypical hardship on a prisoner beyond what was contemplated in the realm of conditions of the original sentence. The court held that no liberty interest existed in transfers to administrative segregation.

In *Amos*, 260 Kan. at 665-66, this court continued to follow the rule that administrative segregation does not place atypical and significant hardships on inmates:

"Inmates [in segregation] must be provided all prescribed medications, clothing that is not degrading, and access to basic personal items unless there is a clear and present danger that inmates will destroy such items or use them to injure themselves or others. Inmates confined to segregation also receive the same meals as the general prison population except in certain circumstances involving their behavior or for religious or medical reasons. Inmates in segregation have access to reading materials, hair care

7

services, telephone privileges, and linen and clothing on the same basis as inmates in the general population, as well as personal legal materials, legal reference materials, the opportunity to shower and shave three times per week, the same communication privileges as inmates in the general population, visitation . . . , and exercise periods outside their cells a minimum of 1 hour per day, 5 days per week. Inmates in disciplinary segregation have additional restrictions relating to television privileges, reading materials, canteen privileges, telephone privileges, and tobacco privileges. Unlike inmates confined to disciplinary segregation, those in administrative segregation have access to the commissary, social and counseling services, religious guidance, recreation, educational services, telephone privileges, reading materials, legal services, and personal property."

The *Amos* court concluded that the petitioner "has no protected liberty interest in avoiding placement in administrative segregation." 260 Kan. at 666.

Then, in *Wilkinson v. Austin*, 545 U.S. 209, 224, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005), the United States Supreme Court referred to three factors in determining whether an institutional assignment infringes on a protected liberty interest: the harshness of the conditions, such as deprivation of human contact and environmental and sensory stimuli; the duration of the confinement; and disqualification for parole consideration. The Court thus clarified that duration is a factor to be considered in assessing the hardship that segregated custody places on an inmate.

Consistent with *Wilkinson*, courts have begun to recognize that an inmate may proffer a lengthy term of segregation as evidence of hardship.

In *Trujillo v. Williams*, 465 F.3d 1210 (10th Cir. 2006), the court considered placement of the petitioner in administrative segregation for 750 days while other inmates remained in segregation for the most serious offenses for only 180 days. The court held: "Where, as here, the prisoner is subjected to a lengthy period of segregation, *the duration*

8

*of that confinement may itself be atypical and significant*." (Emphasis added.) 465 F.3d at 1225. The circuit reversed the district court's summary dismissal and remanded the case for evidentiary analysis.

In *Marion v. Columbia Correction Inst.*, 559 F.3d 693 (7th Cir. 2009), the court held that the question of whether 240 days in disciplinary segregation was a type of atypical, significant hardship that would implicate a protected liberty interest could not be decided at the pleadings stage. The court noted that it was "clear that a term of segregation as lengthy as [the petitioner's] requires scrutiny of the actual conditions of segregation." 559 F.3d at 698. The court accordingly remanded the case to the district court for further fact-finding. 559 F.3d at 699.

In *Harden-Bey v. Rutter*, 524 F.3d 789, 792 (6th Cir. 2008), the Sixth Circuit considered a plaintiff in a § 1983 action who had been assigned to administrative segregation for a period of approximately 3 years. The court determined that the duration of such restrictive confinement was a key factor in evaluating a claim that the confinement constituted an atypical and significant hardship:  "In deciding whether changes to an inmate's conditions of confinement implicate a congnizable liberty interest, both *Sandin* and [*Wilkinson*] considered the nature of the more-restrictive confinement *and* its duration in relation to prison norms and to the terms of the individual's sentence." 524 F.3d at 792.

In *Wilkerson v. Goodwin*, 774 F.3d 845 (5th Cir. 2014), the plaintiff was confined for nearly 39 years in "closed-cell restriction" following the murder of a corrections officer. The circuit compared decisions from other courts and determined that duration in segregated confinement does not necessarily give rise to a liberty interest in ranges from 12 months to 15 months and up to 2 1/2 years. Eight years in administrative custody, on the other hand constituted an "atypical" confinement or an "'atypical and significant

9

hardship on the inmate in relation to the ordinary incidents of prison life.'" 774 F.3d at 855. The court considered the fact that the restrictions on the petitioner's freedom were less severe than the restrictions on other inmates who had been placed in solitary confinement: the petitioner was allowed some contact visits, telephone privileges, peer counseling, and correspondence course. The court reasoned:

> "Were the duration of [the petitioner's] solitary confinement less lengthy, such distinctions might become material. Here, however, we consider the 23-hour-a-day in cell isolation, limited physical exercise, and limited human contact, together with the extraordinary length of time that [the petitioner] has been held in such conditions. Viewed collectively, there can be no doubt that these conditions are sufficiently severe to give rise to a liberty interest under *Sandin*." 774 F.3d at 855-56.

The court acknowledged that the initial security classification in administrative segregation does not implicate a liberty interest, but such an interest may arise when the classification is attended by extraordinary circumstances, and indefinite placement in highly restrictive conditions implicates a liberty interest, "even if that placement is the result of [a constitutionally sound] initial classification." 774 F.3d at 858.

We conclude that the duration of segregated placement is a factor that courts must consider in determining whether an inmate has met the *Sandin* standards for demonstrating a liberty interest infraction. In extreme cases, courts may deem duration the dominant factor. While it may be difficult to ascertain at what point duration becomes extreme, drawing such a conclusion in a particular case requires specific inquiry and fact-finding by a district court to determine the specific conditions of the administrative segregation. Relevant questions include the frequency of visitation, access to exercise or work programs, the degree of supervision, and how those conditions compare with the conditions of inmates in the general prison population. We remind tribunals that isolation from human contact may constitute an especially harsh condition of incarceration, as was

10

pointed out by Justice Kennedy in his concurring opinion in *Davis v. Ayala*, 576 U.S. ___, 135 S. Ct. 2187, 2209-10, 192 L. Ed. 2d 323 (2015).

In cases where such relevant factors were not developed below, the usual remedy would be to remand for factual findings and corrected application of the law to those findings. Such a remedy would be particularly important in the present case, because the record simply does not contain a factual basis for evaluating whether the conditions of Jamerson's placement were "atypical" and constituted a "significant hardship in relation to the ordinary incidents of prison life." In the present case, however, the remedy of remand is not available because Jamerson is no longer in administrative segregation.

We nevertheless issue this opinion to provide guidance to courts as they encounter liberty interest claims in the future. We note that an opinion that is not essential to the decision constitutes judicial dictum. *City of Wichita v. Molitor*, 301 Kan. 251, 264, 341 P.3d 1275 (2015) (citing Black's Law Dictionary 549 [10th ed. 2014]); *Law v. Law Company Building Assocs.*, 295 Kan. 551, 564, 289 P.3d 1066 (2012). Judicial dictum is an expression of opinion on a question directly involved in a particular case, argued by counsel, and deliberately ruled on by the court, although not necessary to a decision. While not binding as a decision, judicial dictum is entitled to greater weight than obiter dictum and should not be lightly disregarded. *Crescent Ring Co. v. Travelers Indemnity Co.*, 102 N.J.L. 85, 89, 132 A. 106 (1926); see also *United States v. Bell*, 524 F.2d 202, 206 (2nd Cir. 1975) (judicial dictum is considered opinion that, while not binding on appellate courts, may provide guidance to lower courts and must be given considerable weight); see also *D'Antuono v. Service Road Corp.*, 789 F. Supp. 2d 308, 334 (D. Conn. 2011) (judicial dictum designed to guide lower courts).

Jamerson's request for relief is now moot, and the courts are without jurisdiction to grant him the relief that he requests.