NOT DESIGNATED FOR PUBLICATION

No. 122,387

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

MATTHEW E. ASTORGA,
*Appellant*,

v.

LEAVENWORTH COUNTY SHERIFF,
*Appellee*.

MEMORANDUM OPINION

Appeal from Leavenworth District Court; MICHAEL D. GIBBENS, judge. Opinion filed November 6, 2020. Affirmed in part, reversed in part, and remanded with directions.

*Chadler E. Colgan* and *Burlon Davis*, legal intern, of Colgan Law Firm LLC, of Kansas City, for appellant.

*Mollie R. Hill*, general counsel, Leavenworth County Sheriff's Office, for appellee.

Before WARNER, P.J., STANDRIDGE and GARDNER, JJ.

PER CURIAM: A jury convicted Matthew E. Astorga of premeditated murder, but the United States Supreme Court overturned his hard 50 sentence. While waiting in the Leavenworth County Jail to be resentenced, Astorga filed a K.S.A. 60-1501 petition, alleging his administrative segregation violated his constitutional rights. After an evidentiary hearing, the district court denied his petition.

On appeal, Astorga raises three issues: that keeping him in administrative segregation indefinitely violated his protected liberty interest; that various other acts

1

deprived him of his constitutional rights; and that the district court improperly required expert testimony. We agree in part.

*Factual and Procedural Background*

Matthew E. Astorga has been incarcerated since December 2008. A Leavenworth County jury convicted him of first-degree premeditated murder, and the district court sentenced him to a hard 50 life sentence. See *State v. Astorga*, 295 Kan. 339, 284 P.3d 279 (2012), *cert. granted, judgment vacated*, 570 U.S. 913, 133 S. Ct. 2877, 186 L. Ed. 2d 902 (2013). The United States Supreme Court granted Astorga's petition for writ of certiorari, vacated the judgment, and remanded the case to the Kansas Supreme Court for further consideration. In 2014, on remand from the United States Supreme Court, the Kansas Supreme Court affirmed Astorga's conviction but held that his sentence had violated his Sixth Amendment right to a jury trial. See *Alleyne v. United States,* 570 U.S. 99, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013). It vacated his sentence and remanded the case for resentencing. *State v. Astorga*, 299 Kan. 395, 396, 324 P.3d 1046 (2014). Astorga is still awaiting resentencing.

In August 2018, Astorga was transferred from Larned Correctional Mental Health Facility to the Leavenworth County Jail. In November 2018, he filed a pro se K.S.A. 60-1501 petition, alleging the Leavenworth County Jail had subjected him to unlawful, unnecessary, and inhumane restrictions. That petition listed 12 complaints about his living conditions, his medical treatment, and his administrative segregation. Astorga's counsel followed up with a memorandum of law in support of Astorga's pro se petition. The jail responded, disputing each claim.

In February 2019, the district court held an evidentiary hearing. We summarize the testimony below.

*Astorga's testimony*

Astorga testified that the jail had placed him in solitary confinement upon his arrival in August 2018. His "max custody" status subjected him to solitary confinement, placement in a special jail pod (G-Pod), lockdown for 23 hours per day, and denial of canteen privileges. The jail staff told him he would remain in max custody until he left the jail, and he had not had a 30-day review for his behavior.

Astorga complained that the jail was retaliating, as it had no reason to place him in segregation. Although he had been in max custody in the Kansas Department of Corrections (KDOC) for eight and a half years, Larned had recently placed him in the general population. Yet the jail placed him in max custody. Astorga felt that this was in retaliation for several past incidents. According to Astorga, Mark Metcalf, the commander over the jail division for the Leavenworth Sheriff's Office, "pretty much agreed with [him]" when Astorga said his max custody must be punishment for all his past incidents. Astorga had only one write-up in his 10 years at the jail: assault of a staffer in November 2018. But later he admitted that Larned staff had caught him with a knife, that he had multiple disciplinary reports at KDOC, and that several other incidents at the jail had been dismissed.

The jail did not treat him any differently than any other inmate housed in G-Pod, and it allowed him special video visits with his daughter.

Astorga also complained about specific living conditions. First, he complained that the jail, after tasing him during the November 2018 incident, put him in a cell with no light for 30 days. Although he was currently in a lighted cell, he was afraid the jail would put him back as punishment. Astorga also admitted that he had broken the light in his cell in the past.

3

Second, for a time the jail did not allow him cleaning supplies. Instead, the staff would clean his cell. But, Astorga complained, things would go missing. He admitted that the jail allowed him cleaning supplies after he had filed his petition.

Third, Astorga complained G-Pod would flood. He had filed two grievances about the flooding. After that, the jail cleaned the pod and he had no more complaints about its cleanliness.

Fourth, the jail had opened a piece of his legal mail when he first arrived from Larned. But his main complaint was that the jail delayed giving him his personal mail.

Finally, Astorga said he had worn his religious medallions during his previous visits, but this time the jail would not allow them. The jail staff told him he could not have his possessions because of his prior incidents.

As to his medical issues, Astorga suffered from anxiety and arthritis. He wanted high doses of Tylenol for his pain, but the jail allowed Tylenol only twice a month. Although Astorga admitted he had hepatitis, he said that Tylenol does not complicate hepatitis patients' health. Astorga testified that a judge had once ordered him to take diazepam, and he wanted it again to help with his anxiety. But to receive both more Tylenol and diazepam, the jail told him he would have to make a medical request, which costs $5. Astorga also said the jail gave him Synthroid for his thyroid and Zyprexa. But he refused the Zyprexa because he had a bad reaction to it. He characterized his mental health as "bad."

*Wardrop's testimony*

Melissa Wardrop had been Astorga's nurse at the jail for seven years. She would check on Astorga whenever he had been tasered or had been in an altercation, which was

4

"too many to count." She also administered Astorga's medication and maintained his medical transfer sheets. When he arrived in August 2018, she received both his Larned and KDOC transfer sheets. Neither sheet showed a prescription for diazepam or any other prescription for anxiety. The only prescriptions were Synthroid for his thyroid and Zyprexa for his psychosis.

Wardrop stated the jail has rules about distributing Tylenol, as it could create problems in patients with liver problems, like hepatitis C. For an inmate to receive any more than two packets of Tylenol a month, they must have a medical justification.

A nurse visit costs $5. But Wardrop testified an inmate could still see her if they did not have enough money. She also said she explained to Astorga the procedure for receiving medication. And Astorga had never talked to her about other medication, never complained about arthritis or chronic pain, and never placed a sick call during his recent stay.

*Metcalf's testimony*

Metcalf was commander over the jail division for the Leavenworth Sheriff's Office. When Astorga arrived at the jail in August 2018, they placed him in G-Pod for security reasons because of his repeated behavior. Astorga had assaulted jail staff and a jail inmate in the past and had an extensive history of violence at KDOC. Metcalf noted that Astorga's max custody placement was neither retaliatory nor disciplinary, but was based "upon his actions, his threat level, and other instances that have occurred within the jail, multiple attacks against officers being one of those." Astorga had received a 30-day review, but Astorga would not get out of max custody during his stay at the jail.

When Astorga first arrived, they placed him in a special cell designed for him. In the past, Astorga would destroy his cell's light fixture and attached sprinkler head, which

5

would flood the pod. This new cell had a special sprinkler system and did not have an artificial light. The jail housed Astorga in this cell until around daylight savings time, at which point they moved him into a cell with an artificial light.

G-Pod's inmates are subject to certain restrictions, and the jail does not allow them most personal items or canteen. But the jail provides basic hygiene items, legal paperwork, paper, pen, and phone calls. Although the jail does not allow other segregated inmates to have video calls, it allowed Astorga video calls with his daughter. The jail does not allow inmates to wear jewelry, so they had denied Astorga's request to wear his religious medals. But inmates could have pictures of their religious items. The jail allows only soft-sided books, and it provides donated Gideon Bibles. But if an inmate wants another type of soft-sided Bible, he would have to purchase it through a manufacturer or distributor.

Metcalf also addressed the cleaning-supplies issue. At first, the staff cleaned Astorga's cell. The jail did not allow Astorga cleaning supplies because he could have used them as a weapon. Yet the jail now allowed him to clean his own cell.

*The district court's decision*

The district court denied Astorga's petition. It found that the jail had placed Astorga in administrative segregation and that the sheriff had the right to make administrative decisions without interference from the courts, unless those decisions interfered with Astorga's constitutional rights. And the district court found that Astorga had not shown any violation of his constitutional rights. As to his administrative segregation, the district court found that Astorga's testimony was insufficient to show a constitutional violation, and that he would need an expert on penal corrections to opine as to whether the conditions of confinement in administrative segregation rise to the level of a constitutional claim. As to the jail's medical care system, the district court held that the

6

jail was not deliberately indifferent. It found that the jail provided Astorga medication and care and that its system worked. The district court also said that it would need expert testimony to show the jail's administrative medical care system violated the Constitution.

Astorga timely appeals.

*Did Astorga's Administrative Segregation Violate a Protected Liberty Interest?*

On appeal, Astorga first asserts that the district court erred in finding his administrative segregation did not violate his constitutional rights. Citing *Jamerson v. Heimgartner*, 304 Kan. 678, 682, 372 P.3d 1236 (2016), he argues that his prolonged administrative segregation violated his protected liberty interest by imposing an atypical and significant hardship.

*Standard of review*

When, as here, the district court held an evidentiary hearing, we review a district court's decision on a K.S.A. 60-1501 petition to determine whether the district court's factual findings are supported by substantial competent evidence and are enough to support the court's conclusions of law. *Rice v. State*, 278 Kan. 309, 320, 95 P.3d 994 (2004); *White v. Shipman*, 54 Kan. App. 2d 84, 88, 396 P.3d 1250 (2017). Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as adequate to support a conclusion. *State v. Doelz*, 309 Kan. 133, 138, 432 P.3d 669 (2019). We review the district court's conclusions of law de novo. *White*, 54 Kan. App. 2d at 88.

*General legal principles*

A petition under K.S.A. 60-1501 is "a procedural means through which a prisoner may challenge the mode or conditions of his or her confinement, including administrative actions of the penal institution." *Safarik v. Bruce*, 20 Kan. App. 2d 61, 66-67, 883 P.2d 1211 (1994). To state a claim for relief, a petition must allege "shocking and intolerable conduct or continuing mistreatment of a constitutional stature." *Johnson v. State*, 289 Kan. 642, 648, 215 P.3d 575 (2009). "'Maintenance and administration of penal institutions are executive functions and it has been said that before courts will interfere the institutional treatment must be of such a nature as to clearly infringe upon constitutional rights, be of such character or consequence as to shock general conscience or be intolerable in fundamental fairness.'" *Anderson v. McKune*, 23 Kan. App. 2d 803, 810, 937 P.2d 16 (1997).

Astorga claims that his administrative segregation at the jail from August 2018 on meets that standard. As the district court found, Astorga's "max custody" status at the county jail was essentially administrative segregation. Prisons use administrative segregation "as a method for physically segregating from the general population those prisoners who, for certain reasons, cannot be placed in the general prison population." *Jamerson*, 304 Kan. at 681. Confinement in disciplinary segregation is imposed when an inmate has been found to have committed a misconduct violation. Administrative segregation may be imposed when an inmate poses a threat to security, when disciplinary charges are pending against an inmate, or when an inmate requires protection. 304 Kan. at 681. "A curious result of the distinction is that *punitive* segregation is generally of a short duration, while *administrative* segregation may extend for periods of years, or even decades." *Jamerson,* 304 Kan. at 681. Astorga's segregation was nonpunitive and per Metcalf's testimony was for safety purposes because Astorga had a long history of violence while in custody.

8

Although the parties consider Astorga to be a pretrial detainee, he is not. "A person lawfully committed to pretrial detention has not been adjudged guilty of any crime. He has had only a 'judicial determination of probable cause as a prerequisite to [the] extended restraint of [his] liberty following arrest.'" *Bell v. Wolfish*, 441 U.S. 520, 536, 99 S. Ct. 1861, 60 L. Ed. 2d 447 (1979). But Astorga is a convicted felon who is in Leavenworth County Jail awaiting resentencing. See *Astorga*, 299 Kan. at 396 (affirming Astorga's first-degree murder conviction and remanding for resentencing). We thus apply the standards relating to a prison inmates.

We apply a two-step analysis to review an inmate's claim of a due process violation in a K.S.A. 60-1501 proceeding. First, we determine whether the corrections facility deprived the inmate of a recognized liberty or property interest. If we find such a deprivation, we then determine whether the inmate received the extent and nature of the process due to him or her under the circumstances. *Hogue v. Bruce*, 279 Kan. 848, 850-51, 113 P.3d 234 (2005).

*The* Sandin *standard and relevant factors*

Courts generally give penal authorities great deference in the management and operation of their institutions. Yet inmates still retain certain constitutionally protected liberty interests, and the deprivation of those interests implicates the right to due process. *Jamerson*, 304 Kan. at 681. Astorga asserts a liberty interest here.

The United States Constitution does not entitle an inmate to any particular degree of liberty in prison; thus, changes to an inmate's prison classification do not involve deprivations of liberty. See *Amos v. Nelson*, 260 Kan. 652, 665-66, 923 P.2d 1014 (1996) (holding inmate had no protected liberty interest in avoiding initial placement in administrative segregation). So moving an inmate into administrative segregation does not involve deprivation of a liberty interest independently protected by the Due Process

9

Clause. *Bailey v. Shillinger*, 828 F.2d 651, 652 (10th Cir. 1987); *Abbott v. McCotter*, 13 F.3d 1439, 1442 (10th Cir. 1994).

But administrative segregation itself may infringe a protected liberty interest. A protected liberty interest may arise in this context when the institutional authority imposes a restraint on an inmate's already limited freedom and the restraint is atypical and a significant hardship on the inmate in relation to the ordinary incidents of prison life. 304 Kan. at 681. See *Sandin v. Conner*, 515 U.S. 472, 485, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995) (finding no liberty interest protecting against a 30-day assignment to segregated confinement because it did not "present a dramatic departure from the basic conditions of [the inmate's] sentence").

In *Wilkinson v. Austin*, 545 U.S. 209, 223-24, 125 S. Ct. 2384, 162 L. Ed. 2d 174 (2005), the United States Supreme Court developed the *Sandin* standard by using three factors to determine whether an institutional assignment such as administrative segregation infringes on a protected liberty interest: (1) the harshness of the conditions, such as deprivation of human contact and environmental and sensory stimuli; (2) the duration of the confinement in relation to prison norms and to the terms of the individual's sentence; and (3) disqualification for parole consideration. See *Jamerson*, 304 Kan. at 683. *Wilkinson* found a protected liberty interest:

> "For an inmate placed in OSP, almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin*, placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. *Austin I*, 189 F. Supp. 2d, at 728. While any of these conditions standing

10

alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP. *Sandin, supra,* at 483, 115 S. Ct. 2293." *Wilkinson*, 545 U.S. at 223-24.

Astorga relies on *Wilkinson*'s factors as restated and applied in *Estate of DiMarco v. Wyoming Department of Corrections, Division of Prisons*, 473 F.3d 1334, 1342 (10th Cir. 2007):

"(1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement, as it did in *Wilkinson*; and (4) the placement is indeterminate (in *Wilkinson* the placement was reviewed only annually)."

*Jamerson* suggested additional factors to guide a district court in determining the fourth factor—when duration becomes extreme:

"We conclude that the duration of segregated placement is a factor that courts must consider in determining whether an inmate has met the *Sandin* standards for demonstrating a liberty interest infraction. In extreme cases, courts may deem duration the dominant factor. While it may be difficult to ascertain at what point duration becomes extreme, drawing such a conclusion in a particular case requires specific inquiry and fact-finding by a district court to determine the specific conditions of the administrative segregation. Relevant questions include the frequency of visitation, access to exercise or work programs, the degree of supervision, and how those conditions compare with the conditions of inmates in the general prison population. We remind tribunals that isolation from human contact may constitute an especially harsh condition of incarceration, as was pointed out by Justice Kennedy in his concurring opinion in *Davis v. Ayala*, 576 U.S. ___, 135 S. Ct. 2187, 2209-10, 192 L. Ed. 2d 323 (2015)." *Jamerson*, 304 Kan. at 685-86.

11

*Jamerson*'s guidance is admittedly "judicial dictum," as its statements on duration were not essential to its decision or binding on the courts. Still, it is to be "given considerable weight and [to] provide[ ] guidance to lower courts." 304 Kan. 678, Syl. ¶ 7.

### *Application to Astorga's case*

We agree that the district court should have considered the *Sandin* standard and the relevant factors noted above in determining whether a defendant's segregation violates his or her protected liberty interest by imposing an atypical and significant hardship.

Despite this developed legal structure, the district court did not cite or apply *Jamerson*'s factors, or other factors, and cited no cases as guiding its determination. The court found that the evidence did not rise to a constitutional violation, yet its ruling does not show that it was aware of the *Sandin* standard for showing a liberty interest infraction—its decision never asks or answers whether Astorga's confinement "'imposes atypical and significant hardship on [him] in relation to the ordinary incidents of prison life." *Wilkinson*, 545 U.S. at 223. Yet that is the controlling legal test.

Finding whether these factors exist, such as whether duration is extreme, "requires specific inquiry and fact-finding by a district court to determine the specific conditions of the administrative segregation." *Jamerson*, 304 Kan. at 685-86. The Kansas Supreme Court told us in *Jamerson* how it would handle a case that did not develop the relevant facts enough to apply its multiple-factor test:

> "In cases where such relevant factors were not developed below, the usual remedy would be to remand for factual findings and corrected application of the law to those findings. Such a remedy would be particularly important in the present case, because the record simply does not contain a factual basis for evaluating whether the

12

conditions of Jamerson's placement were 'atypical' and constituted a 'significant hardship in relation to the ordinary incidents of prison life.'" 304 Kan. at 686.

Here as in *Jamerson*, the relevant facts were not developed in the district court. There are many facts we do not know about Astorga's case. Relating to the jail's penological interest, we do not know what Astorga's behavior has been since November 2018. Nor do we not know how the jail typically handles reviews of administrative segregation. We know that Astorga had one 30-day review, but we cannot tell if or how often Astorga will receive another. Relating to the harshness of conditions in administrative segregation, we do not know how often Astorga may communicate with his family. Nor do we know what opportunity he has for conversation or interaction with anyone while in or out of his cell. We cannot tell what the degree of his supervision is. The record reflects that Astorga cannot work, as he did while in prison, but it does not reflect if or where he can exercise during his one hour a day out of his cell. As for the indefinite duration, we know Astorga will be in administrative segregation as long as he remains at the jail, and he will remain at the jail until he is given a jury trial on resentencing. We do not know when that may be, but given the current backlog of cases awaiting jury trials, it is unlikely that the end is in sight.

We do know some facts, of course, based on the evidentiary hearing. But "appellate courts do not make factual findings in the first instance; we only review district court findings." *State v. Estrada-Vital*, 302 Kan. 549, 557, 356 P.3d 1058 (2015).

*Defining the baseline comparator*

Even defining the ordinary baseline presents a challenging task, as different courts use different baselines for comparison. This is because the standard in *Sandin* is a relative one, asking whether the confinement imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. 515 U.S. at 483-84; *Wilkinson*,

13

545 U.S. at 223. *Sandin* compared the conditions in disciplinary segregation to conditions in the general population and to conditions in administrative segregation. 515 U.S. at 486. "In *Sandin*'s wake the Courts of Appeals have not reached consistent conclusions for identifying the baseline from which to measure what is atypical and significant in any particular prison system." *Wilkinson*, 545 U.S. at 223 (finding that assignment to supermax imposed an atypical and significant hardship under any plausible baseline). See, e.g., *Beverati v. Smith*, 120 F.3d 500, 503 (4th Cir. 1997) (viewing the baseline as the conditions experienced by inmates in the general population); *Griffin v. Vaughn,* 112 F.3d 703, 706-08 (3d Cir. 1997) (viewing the baseline as the typical conditions of administrative segregation); *Wagner v. Hanks*, 128 F.3d 1173, 1175 (7th Cir. 1997) (defining the baseline as the conditions of non-disciplinary segregation in a state's most restrictive prison).

Kansas cases have not addressed the baseline question. And the question of the appropriate baseline is complicated even more because Astorga is in jail, not in prison. The relevant inquiry here appears to be whether Astorga's confinement imposes an atypical and significant hardship on him in relation to the ordinary incidents of jail life. That norm may be different than in the many cases discussing what the ordinary incidents of prison life are. See, e.g., *Amos*, 260 Kan. at 665 (reviewing El Dorado Correctional Facility's administrative segregation guideline requiring that inmates in segregation have access to reading materials, hair care services, telephone privileges, and linen and clothing on the same basis as inmates in the general population, as well as personal legal materials, legal reference materials, the opportunity to shower and shave three times per week, the same communication privileges, and so forth).

Because we lack cases informing us about the ordinary incidents of jail life, the factual record takes on heightened significance. Metcalf's testimony shows that those in the general population at the jail are allowed visitation with family and have commissary privileges. Astorga was the only max custody prisoner in the jail. Others were in

14

segregation for disciplinary reasons, and Astorga was treated the same as they were except he was allowed electronic visitation with his family—a privilege not typically available to prisoners in segregation. No persons in segregation get commissary privileges. But beyond that, we do not know. We cannot tell, for example, what the disciplinary or administrative segregation norms or guidelines are for the jail or how they may compare to the guidelines for the jail's general population.

So we will remand to the district court for an evidentiary hearing to develop the facts and apply the *Sandin* and *Jamerson* factors to determine whether Astorga's administrative segregation infringes on a protected liberty interest.

*Requirement of Expert Testimony*

Astorga also contends that the district court judge had the expertise and the duty to determine whether the jail had violated his constitutional rights, that there is no legal requirement for expert testimony in this kind of case, and that the court cannot abdicate its decision-making to a third-party expert. Because we are remanding the case, we find it unnecessary to resolve Astorga's contention that the district court improperly required him to present expert testimony. Yet since this issue is likely to recur on remand, we briefly address the framework in which this concern arises. See *State v. Hernandez*, 294 Kan. 200, 209, 273 P.3d 774 (2012).

The district court stated:

"Now, I've taken a look at Mr. Astorga's testimony in this matter and my notes on it. And noted that over time, the courts have allowed expert testimony when the courts find it to be helpful to the finder of fact, whether it be a jury or the judge himself. In this case, we didn't have any expert testimony concerning administrative segregation and the conditions of confinement in it, and the Court is not an expert on that itself, so I cannot say just per se that those conditions rise to a constitutional claim. I think it's a problem I

15

see with many of the habeas corpus petitions that I've heard the last year coming out of our Department of Corrections is the Court just doesn't have enough evidence by which to say there's a constitutional violation and that's what I find in this case. Mr. Astorga's testimony in and of itself is insufficient. I think I would need an expert on penal corrections in order to have them render an opinion as to whether his conditions of confinement an—and administrative segregation rise to the level of a constitutional claim."

Kansas cases have not established what finding a district court must make before requiring, rather than permitting, expert testimony. But other courts have done so. Requiring expert testimony rather than simply permitting it represents an extraordinary step, one to be taken only when "unusually complex or esoteric issues are before the jury." *White v. Leeder*, 149 Wis. 2d 948, 960, 440 N.W.2d 557 (1989). See *Netzel v. State Sand & Gravel Co.*, 51 Wis. 2d 1, 7, 186 N.W.2d 258 (1971); *Cedarburg Light & Water Comm'n v. Allis-Chalmers Mfg. Co.*, 33 Wis. 2d 560, 567, 148 N.W.2d 13 (1967). Before expert testimony is required, the circuit court must find that the matter involved is "not within the realm of the ordinary experience of mankind." *Cramer v. Theda Clark Memorial Hospital*, 45 Wis. 2d 147, 150, 172 N. W. 2d 427 (1969).

This appears to be a reasonable standard, given that under Kansas law, the role of an expert is to assist the fact-finder in understanding scientific or technical facts and principles whose applications and interaction lie beyond the capacity and understanding of laymen. *Hare v. Wendler*, 263 Kan. 434, 440, 949 P.2d 1141 (1997). "[T]he well-established test for determining whether expert testimony is required is whether the subject matter is too complex to fall within the common knowledge of the jury and is 'beyond the capability of a lay person to decide.'" *Williamson v. Amrani*, 283 Kan. 227, 245, 152 P.3d 60 (2007).

We recognize that the task facing the district court—making the fact-specific inquiry to determine the specific conditions of administrative segregation and comparing

16

them to a baseline not yet established under Kansas law—may be daunting. See *Harper v. Young*, 64 F.3d 563, 564-65 (10th Cir. 1995) (recognizing that applying *Sandin* "is a question of no small difficulty"), *aff'd* 520 U.S. 143, 117 S. Ct. 1148, 137 L. Ed. 2d 270 (1997). Yet we believe the relevant factors outlined in the cases summarized above give enough structure to guide the court's reconsideration of the issues without expert testimony. Those factors relate to matters within the realm of the ordinary experience of mankind, which require no special learning, study, or experience.

*Specific Conditions of Confinement*

We next address Astorga's claims that specific conditions of his confinement violated his constitutional rights. We initially note that for each claim, Astorga fails to include legal argument or citation to authority that would establish a violation of his constitutional rights. Failure to support a point with pertinent authority or show why it is sound despite a lack of supporting authority or in the face of contrary authority is like failing to brief the issue. *State v. Salary*, 309 Kan. 479, 481, 437 P.3d 953 (2019). So we consider these individual conditions to be waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018). Even so, we address the claims individually below to explain why they do not state redressable constitutional violations.

*Medical treatment*

Astorga claims the jail violated his right to medical treatment.

We first note that the district court's insistence on expert testimony colored its findings on this issue:

> "When we're dealing with medical cases, once again the testimony of medical experts is key in this area. Mr. Astorga's testified about issues that he's had getting his

17

medications and stuff like that. I would think that—well, I know the only way that the Court could find that there's deliberate indifference is to have a medical professional go through and audit the system that is in place and then testify in this court. That has not occurred in this case. And the sheriff has shown that they do have medical care in the jail; that they have a system by which administratively it works, and the Court cannot interfere with the administrative system setup by the sheriff unless there is proof of a constitutional violation."

By this language, the district court alludes to the fact that to establish a violation of the Eighth Amendment to the United States Constitution, an inmate must prove that the state prison officials displayed deliberate indifference toward the inmate's serious medical need. See *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251 (1976). Deliberate indifference sets a particularly high bar to recovery, as Chief Judge Posner has illustrated:

"Prison employees who act with deliberate indifference to the inmates' safety violate the Eighth Amendment. But to be guilty of 'deliberate indifference' they must know they are creating a substantial risk of bodily harm. If they place a prisoner in a cell that has a cobra, but they do not know that there is a cobra there (or even that there is a high probability that there is a cobra there), they are not guilty of deliberate indifference even if they should have known about the risk, that is, even if they were negligent—even grossly negligent or even reckless in the tort sense—in failing to know. *Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir.1982). But if they know that there is a cobra there or at least that there is a high probability of a cobra there, and do nothing, that is deliberate indifference. *Farmer v. Brennan,* 511 U.S. 825, ——, 114 S. Ct. 1970, 1979, 128 L.Ed.2d 811 (1994); *Miller v. Neathery,* 52 F.3d 634, 638 (7th Cir. 1995)." *Billman v. Indiana Dep't of Corrections*, 56 F.3d 785, 788 (7th Cir. 1995).

Deliberate indifference to serious medical needs is shown when prison officials prevent an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel able to evaluate the need for treatment. *Darnell v. Simmons*, 30 Kan. App. 2d 778, 781, 48 P.3d 1278 (2002). Deliberate indifference has both an

objective and a subjective component. The objective component is met if the petitioner shows the deprivation is sufficiently serious. A medical need is sufficiently serious if treatment has been diagnosed for it or if the need for medical treatment is so obvious that a layperson would recognize the need. *Laubach v. Roberts*, 32 Kan. App. 2d 863, 872, 90 P.3d 961 (2004). The subjective component is met if the petitioner shows that a prison official "knows of and disregards an excessive risk to inmate health or safety." *Darnell*, 30 Kan. App. 2d at 781 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 [1994]).

Here, the district court required expert testimony by one who had audited the medical system as "the only way that the Court could find . . . deliberate indifference" about the jail's medical system. But as we read Astorga's petition, he did not mainly complain about a systemic or general problem with the jail's delivery of medical services. Rather, he contends that the jail did not properly administer his medication and refused to give him Tylenol for his arthritis in his shoulder and diazapam for his anxiety. Whether the jail showed deliberate indifference in not giving Astorga the medications he desired was not so complex as to require expert testimony. Astorga could testify to the pain he experienced, his attempts to obtain help, and the responses he received, all of which can be used to show evidence of deliberate indifference. And the jail's medical staff could fully address those issues without the need of an expert. Compare *Ledford v. Sullivan*, 105 F.3d 354, 358-59 (7th Cir. 1997) (expert testimony not necessarily required to establish deliberate indifference when the facts are within the jury's understanding) with *Greason v. Kemp*, 891 F.2d 829, 835 (11th Cir. 1990) (expert testimony required when prisoner alleged *medical misdiagnosis* resulted from deliberate indifference or negligence).

Nurse Wardrop addressed those issues here. She testified that Astorga had not been prescribed diazepam or any other medicine for anxiety; his only prescriptions were Synthroid for his thyroid and Zyprexa for his psychosis. She has offered him the

19

medicines prescribed for him, yet he refuses to take them, as he acknowledges. She explained to Astorga the procedure for receiving medication, he never talked to her about other medication, never complained about arthritis or chronic pain, and has never placed a sick call during his current stay at the jail.

Wardrop explained the jail's rules about distributing Tylenol. Because Tylenol could create problems in patients with liver problems, such as those patients with hepatitis C, an inmate cannot receive more than two packets of Tylenol a month without a medical justification. Astorga did not show he had a medical justification. Instead, he admitted he had hepatitis, but he disagrees that Tylenol complicates a hepatitis patient's health. Astorga thus disagrees with the medical staff at the jail.

Astorga's difference of opinion with the medical staff at the jail is not actionable:

> "[A] difference of opinion with the medical staff as to the optimal pain-management regimen does not amount to deliberate indifference. *See Thompson v. Gibson*, 289 F.3d 1218, 1222 (10th Cir. 2002) ('[A] medical difference of opinion . . . is not actionable under the Eighth Amendment.')." *Todd v. Bigelow*, 497 F. Appx. 839, 842 (10th Cir. 2012) (unpublished opinion).

Where a prisoner is experiencing pain but has not been denied all pain medication, the choice of pain medication by the medical staff "simply does not demonstrate subjective deliberate indifference." *Vreeland v. Fisher*, 682 F. Appx. 642, 649 (10th Cir. 2017) (unpublished opinion) (citing *Self v. Crum*, 439 F.3d 1227, 1232 [10th Cir. 2006]).

Wardrop also addressed the costs of medical care, saying that a nurse visit costs $5, but an inmate who lacked funds could still see her. Astorga complains that the process for inmates in the jail are "not well suited to managing chronic conditions or for long term placement." But as proof, Astorga points only to the $5 fee for nurse visits and contends this could lead to the "cessation of all telephone contact and visits with his

family." Astorga prefers to spend his money on telephone calls to his family rather than on visits to the nurse. But his personal preference fails to show the jail's deliberate indifference to Astorga's serious medical needs, particularly when he can visit the nurse without paying even the nominal cost.

To the extent Astorga alleges that the jail's medical system generally violates the deliberate indifference standard, he fails provide legal argument in support of this theory, and thus abandons it. We affirm the district court's conclusion that Astorga failed to prove deliberate indifference to his serious medical needs as right for the wrong reason. See *State v. Williams*, 311 Kan. 88, 91, 456 P.3d 540 (2020).

### *The jail's opening of his mail*

Astorga contends that the jail opened his legal mail once outside his presence and delayed giving him his personal mail for three months. Yet he shows no evidence of improper motive or interference with his access to counsel or the courts.

Although an inmate's legal mail may be opened only in his or her presence, a single incident alone does not itself support an action for a violation of an inmate's constitutional rights. *Bloom v. Muckenthaler*, 34 Kan. App. 2d 603, 609-10, 127 P.3d 342 (2005). Thus an isolated incident, with no evidence of improper motive or resulting interference with an inmate's right to counsel or to access to the courts, does not give rise to a constitutional violation. *Smith v. Maschner*, 899 F.2d 940, 944 (10th Cir. 1990); see also *Guajardo-Palma v. Martinson*, 622 F.3d 801, 806 (7th Cir. 2010) (denying constitutional claim from opening of nine pieces of legal mail where plaintiff did not claim resulting intimidation).

"To properly allege a constitutional violation, an inmate must show a pattern of censorship or other practices which chill or impede the inmate's access to legal

21

representation and the courts." 34 Kan. App. 2d at 610. Astorga suggests an improper motive, claiming his testimony proves a pattern that could show retaliation against him. But he has no evidence of that possibility. Rather, the record shows that the jail allowed Astorga access to his attorney, provided him legal paper and writing material, and allowed him to keep his legal mail.

As to the delay in getting his personal mail, Astorga contends the jail sometimes puts his personal mail elsewhere with his personal effects, then delivers it to him in his cell later. But the record fails to show when this occurred, how many times it occurred, why it occurred, or how much delay was caused. And Astorga fails to cite any legal authority to support his claim that these failures violate his constitutional rights.

*Lighting in his cell*

Astorga contends that the jail put him in a cell that had only windows for light for 30 to 60 days. Metcalf testified that this cell had only natural daylight from a window. The jail put Astorga in a cell without a light because he had previously destroyed other cells' light fixtures and attached sprinkler heads, which then flooded the pods. But when daylight savings time occurred, the jail moved Astorga to a new cell with a light in it.

An inmate is entitled to "adequate food, light, clothing, medical care and treatment, sanitary facilities, reasonable opportunity for physical exercise and protection against physical or psychological abuse or unnecessary indignity." *Levier v. State*, 209 Kan. 442, 448, 497 P.2d 265 (1972). Our courts have analyzed an inmate's entitlement to light under the cruel and unusual punishment standard. So, for example, the denial of a light bulb in an inmate's cell for a two-week period did not constitute cruel and unusual punishment. *State v. Rouse*, 229 Kan. 600, 605-06, 629 P.2d 167 (1981). Similarly, confinement in a building without windows failed to constitute cruel and unusual punishment. *Turner v. Maschner*, 11 Kan. App. 2d 134, 135, 715 P.2d 425 (1986).

Astorga fails to show that he lacked adequate lighting for reading or doing other tasks, even when he had only natural light. And he confirmed that he is currently in a cell that has an artificial light. Although he alleges it is too bright and affects his vision, his own testimony shows he knows how to cover it up, dimming it. We find nothing arbitrary about the jail's acts. The jail was aware of how much lighting Astorga's cell received and acted accordingly.

Astorga alleges that he fears the jail will put him back in the cell without a light as punishment. But this is mere speculation. Astorga provides no legal argument or authorities to show how the lighting in either cell violates his constitutional right.

*Denial of cleaning supplies*

Astorga next contends that the jail arbitrarily denied him cleaning supplies. Also, when he returned from being locked in the shower while the staff cleaned his cell, he found that some of his personal possessions were missing.

An inmate is entitled to sanitary facilities. See *Levier*, 209 Kan. at 448. Astorga claims that the jail's arbitrary denial of cleaning supplies violated his rights. But Metcalf testified that the jail removed his cleaning supplies temporarily as a safety precaution after Astorga had tried to assault a staff member, to prevent his access to a mop handle or a broom or chemicals. Still, during that time, the jail staff cleaned Astorga's cell, and Astorga admits that he was allowed cleaning supplies afterward.

Astorga does not complain that he had an unsanitary cell. The evidence fails to show overall squalor at the jail, failure to provide cleaning supplies necessary to maintain minimally sanitary cells, or a resultant serious threat to Astorga's health, which could violate the Eighth Amendment. See *McBride v. Deer*, 240 F.3d 1287, 1292 (10th Cir. 2001); *Hoptowit v. Spellman*, 753 F.2d 779, 784 (9th Cir. 1985). And Astorga admits that

23

after he filed grievances, he no longer had any complaints about the cleanliness of his cell.

To the extent that Astorga may claim a due process deprivation because his personal items were missing, he fails to show that he filed any property claims about his property, or what the resolution was of such claim. Even if the court accepts Astorga's versions of the events as true, he has provided no legal authority showing that these events would support a claim under § 1983.

Random and unauthorized deprivation of a prisoner's property does not violate due process, as long as a meaningful post-deprivation remedy is available. *Hudson v. Palmer*, 468 U.S. 517, 531-33, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984); *Parratt v. Taylor*, 451 U.S. 527, 541, 101 S. Ct. 1908, 68 L. Ed. 2d 420 (1981). A valid § 1983 claim for loss of a prisoner's property must include allegations of deliberate conduct. *Hall v. Bellmon*, 935 F.2d 1106, 1113 (10th Cir. 1991). The Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to property. *Daniels v. Williams*, 474 U.S. 327, 328, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986). Astorga presented no evidence that the staff acted to deliberately deprive him of his property. And he has failed to plead that any post-deprivation remedy for the loss of his property was inadequate. Here, as above, he provides no legal argument or authorities to show how the temporary denial of cleaning supplies violates his constitutional right.

### *Denial of canteen privilege*

Astorga contends the jail denied inmates in his segregation pod "canteen." Astorga notes that the cruelty of this denial is shown by his inability to purchase batteries for his radio, at which he stares 23 hours a day.

24

But a privilege is not a right. Here, again, Astorga fails to show legal authority or argue that he has either a liberty interest or property interest in the canteen generally or that prohibition from the canteen violates his constitutional rights. See *Salary*, 309 Kan. at 481. Our research shows that he does not. See, e.g., *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978) (under Eighth Amendment sentenced prisoners are entitled only to "adequate food, clothing, shelter, sanitation, medical care, and personal safety"), *rev'd sub nom. on other grounds*, *Bell*, 441 U.S. 520 (1979); *Madison v. Parker*, 104 F.3d 765, 768 (5th Cir. 1997) (holding that commissary restrictions did not entitle inmate to due process protections during disciplinary proceeding); *Bennett v. Cannon*, No. C/A NO. 2:05-2634-GR, 2006 WL 2345983, at *2 (D.S.C. 2006) (unpublished opinion) ("There is simply no freestanding constitutional right to canteen privileges at all . . . .").

*Electronic visits*

*Astorga* claims that for months the jail did not permit him electronic visitation with his family. Now, however, he has video visits with his family, but he fears the jail will remove that privilege—a privilege he receives even though no other prisoners in segregation are granted that privilege. Astorga does not allege any infringement on his right to familial association. The separation of powers doctrine embodied in the Kansas constitutional framework imposes a "constitutional case-or-controversy requirement." If an issue fails to present a case or controversy, a Kansas court is without power to decide that issue. "As part of the Kansas case-or-controversy requirement, courts require [that]. . . issues must be ripe, having taken fixed and final shape rather than remaining nebulous and contingent." *State ex rel. Morrison v. Sebelius*, 285 Kan. 875, 896, 179 P.3d 366 (2008). Astorga's fear that the jail will remove his electronic visitation privilege fails to present a ripe issue.

Generally, prisoners have no constitutional right to visitation. See *Mayo v. Lane*, 867 F.2d 374, 375-76 (7th Cir. 1989); *Thorne v. Jones*, 765 F.2d 1270, 1273-74 (5th Cir. 1985). Instead, the Constitution allows prison officials to impose reasonable restrictions on visitation. *Overton v. Bazzetta*, 539 U.S. 126, 123 S. Ct. 2162, 2167, 156 L. Ed. 2d 162 (2003). "Withdrawing visitation privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior." *Overton*, 539 U.S. at 134. The "withdrawal of visitation privileges for a limited period as a regular means of effecting prison discipline . . . is not a dramatic departure from accepted standards for conditions of confinement." 539 U.S. at 137 (citing *Sandin*, 515 U.S. at 485).

Astorga provides no legal argument or authorities to show how the potential denial of video visitation violates his constitutional right. And whether Astorga retains or forfeits his visitation privilege in the future seems to rest in his own hands, as determined by his behavior.

*Law library*

Astorga notes that his petition alleges that he can access the law library kiosk only from midnight to 5 a.m. The jail contested that accusation in its answer. And Astorga failed to present evidence showing that the jail restricted his access to the law library kiosk. Thus, the record has no evidence to support this claim.

True, our Supreme Court has recognized "that the right of prisoners to have access to the courts is a constitutional right. One element of that right is access to a law library or alternative sources of legal knowledge." *Bagby v. Rayl*, 237 Kan. 365, 366, 699 P.2d 521 (1985). But the Constitution does not guarantee a prisoner unlimited access to a law library. Rather, inmates must be allowed a reasonable amount of time to use the library. See, e.g., *Ramos v. Lamm*, 639 F.2d 559, 583-85 (10th Cir. 1980). Prison officials

26

necessarily must regulate the time, manner, and place in which library facilities are used. *Twyman v. Crisp*, 584 F.2d 352, 358 (10th Cir. 1978). So "[t]he fact that an inmate must wait for a turn to use the library does not necessarily mean that he has been denied meaningful access to the courts." *Lindquist v. Idaho State Bd. of Corrections*, 776 F.2d 851, 858 (9th Cir. 1985) (citing *Nadeau v. Helgemoe,* 561 F.2d 411, 418 [1st Cir. 1977]). Here, as above, Astorga provides no legal argument or authorities to show how his access to the law library kiosk violates his constitutional right.

*Deprivation of personal items such as radio, coffee, and art supplies*

Astorga contends that the jail deprived him of his radio, coffee, and art supplies. He argues that he had these items while in the DOC, but that the jail regularly takes them away as punishment. Metcalf testified that personal property that is not allowed in the jail is either given to the transport officer to return to KDOC or is held at the jail to return to the inmate.

But Astorga fails to show that he has any constitutional right to possess these or other items of personal property while he is in jail. If inmates are allowed to possess personal property, they enjoy a protected interest in that property that cannot be infringed on without due process. *Bryant v. Barbara*, 11 Kan. App. 2d 165, 167-68, 717 P.2d 522 (1986). But there is a difference between the inmate's ownership rights in the property and the inmate's right to possess the property while in prison. An inmate has no protected right to possess the property while in prison. *Stansbury v. Hannigan*, 265 Kan. 404, 419-20, 960 P.2d 227 (1998). See 60 Am. Jur. 2d, Penal and Correctional Institutions § 60 (finding "[t]here is no constitutional right to watch television or listen to the radio in prison"); *Tarselli v. Harkleroad*, No. 10-1266, 2012 WL 603219, at *7 (W.D. Pa. 2012) (unpublished opinion) (finding "no authority to support Plaintiff's claim that he has a protectable First Amendment interest in the right to possess artwork, drawings and publications"); *Cunningham v. Jones*, 567 F.2d 653, 659-60 (6th Cir. 1977) (finding that

27

the Eighth Amendment requires only that prisoners receive food adequate to maintain health; it need not be tasty or aesthetically pleasing). Astorga's complaints about his personal property do not rise to the threshold level of a deprivation that satisfies the Eighth Amendment's objective component. And again, Astorga provides no legal argument or authorities to show how the deprivation of his possession of personal items violates his constitutional right.

*Religious medallions and Catholic Bible*

Astorga next contends that the jail took away two religious medallions his daughter had given him, and the jail did not grant his request for a Catholic Bible. Metcalf testified that inmates are not allowed to wear jewelry for safety reasons, so the jail denied Astorga's request to wear his religious medallions, although it let him keep a photograph of them.

To be successful on a free exercise claim, an inmate must allege that prison personnel burdened the practice of his religion without a justification reasonably related to legitimate penological interests. *Turner v. Safley*, 482 U.S. 78, 89, 107 S. Ct. 2254, 96 L. Ed. 2d 64 (1987). Given Metcalf's testimony that the anti-jewelry policy applies to all inmates and is for safety reasons, Astorga cannot succeed on this claim. Rather, the governmental interest in regulating the non-speech element of the medallion justifies the incidental limitation on the First Amendment freedom. *United States v. O'Brien*, 391 U.S. 367, 376, 88 S. Ct. 1673, 20 L. Ed. 2d 672 (1968).

> "The prison's policy of total exclusion of jewelry from the prisoners who are in the maximum security unit is directly related to the prison's security. The medallion involved in this action is designed to be worn about the neck and easily could be used as a weapon. In those circumstances, the prison policy, as long as it is enforced non-discriminatorily, does not violate the plaintiff's First Amendment rights. See *Cagle v.*

*Ciccone*, 308 F. Supp. 1122 (U.S.D.C.W.D.Mo.1969)." *Rowland v. Sigler*, 327 F. Supp. 821, 828 (D. Neb.), *aff'd sub nom. Rowland v. Jones*, 452 F.2d 1005 (8th Cir. 1971)*.

Nor does Astorga's claim about a Bible show that the jail interfered with his ability to exercise his religion. Metcalf's testimony shows that although the jail provided a different Bible for inmates, Astorga was allowed to purchase the Catholic Bible he wanted directly from the manufacturer, for security reasons. So Astorga apparently claims that the jail has a duty to supply him with a Catholic Bible due to his indigent status.

But no such constitutional obligation exists. See, e.g., *Frank v. Terrell*, 858 F.2d 1090, 1091 (5th Cir. 1998) (finding prison officials do not have an affirmative duty to provide free religious materials or other articles to inmates). Prison officials are not required to locate, purchase, or provide religious items for inmates but are required only to refrain from interfering with inmates' ability to locate, purchase, and obtain such materials on their own, at least insofar as obtaining such items is not inconsistent with legitimate prison interests. *Kaufman v. Schneiter*, 474 F. Supp. 2d 1014, 1026 (W.D. Wis. 2007). Here, as with his other claims, Astorga has not given us legal argument or authorities to show how the absence of his medallions or the Bible he wants violates his constitutional right.

We thus find no error in the district court's conclusion that Astorga failed to show that any specific conditions of his confinement violated his constitutional rights. We affirm that conclusion as right for the wrong reason. But we reverse the district court's ruling regarding Astorga's more general challenge to his administrative segregation and remand the case for the court's consideration of that claim under *Sandin* and *Jamerson*.

The district court's judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.