NOT DESIGNATED FOR PUBLICATION

No. 123,655

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of C.A.G. and C.R.G.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; KELLIE HOGAN, judge. Opinion filed January 14, 2022. Affirmed.

*Jordan E. Kieffer*, of Jordan E. Kieffer P.A., of Bel Aire, for appellant natural mother.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GARDNER, P.J., HILL and HURST, JJ.

PER CURIAM: A.R. (Mother), the natural mother of C.A.G. and C.R.G., appeals from the district court's termination of her parental rights. She contends the State presented insufficient evidence to support the court's findings that her parental unfitness was unlikely to change in the foreseeable future and that termination of her parental rights was in the best interests of her children. After carefully reviewing the record and the parties' arguments, this court affirms the district court's determination.

FACTUAL AND PROCEDURAL BACKGROUND

The Sedgwick County Sheriff's office received a report that Mother had left her children, C.A.G. and C.R.G., with friends who were unable to care for them. The sheriff's office conducted a welfare check and determined that Mother had not been seen in

several days and that the individuals with whom the children had been left were allowing people to have sexual intercourse with the children in the home. The officer also observed that there was no running water and the residence was infested with rats. The deputies took the children to the hospital and then placed them in police protective custody.

Two days later, the State filed a child in need of care (CINC) petition against Mother and the purported father alleging abandonment and sexual abuse. Both parents appeared at the temporary custody hearing on September 14, 2018, for the State's CINC petition. Based on evidence at the hearing, the district court found probable cause to believe the health or welfare of the children may be endangered without further care and intervention, and that it was in the best interests of the children to remain in the temporary custody of DCF. The court also issued the following orders:

- Mother and Father submit to drug and alcohol tests;
- Mother abstain from the use of illegal drugs, alcohol, and any prescription drugs without a valid prescription throughout the duration of this case;
- Mother and Father sign all necessary releases of information for assessments, evaluation, tests, and treatment programs;
- Mother must obtain and maintain full-time employment and periodically provide pay stubs or provide proof of weekly job searches or verification of disability and inability to work to DCF social worker/DCF designee;
- Mother obtain and maintain appropriate housing; and
- Mother and Father complete hair follicle testing every 90 days (if the preliminary test came back positive), parenting classes, and random urinalysis (UA) testing.

On November 2, 2018, the district court held an adjudication hearing on the State's CINC petition—Mother did not appear at the hearing and was found to be in default. At

the outset of the hearing, the court noted that the State conducted hair follicle drug tests on both C.A.G. and C.R.G. and both came back positive for methamphetamine. The court noted that Mother failed to comply with the court-ordered drug testing, had not contacted Saint Francis Ministries (SFM) as ordered, or made any progress on any of the other court orders. The district court adjudicated the children CINC and ordered them to remain in DCF custody in an out-of-home placement.

In April 2019, the district court conducted a permanency hearing after Mother completed a 90-day achievement plan with SFM. At that hearing, the district court ordered SFM to update the 90-day achievement plan and meet with Mother to review the plan. The court also ordered Mother to submit to a hair follicle drug test that same day. Although the results from that test are not in the record before this court, the district court noted that Mother failed a UA for THC, methamphetamine, and amphetamine shortly after this hearing. A permanency specialist for reintegration working for SFM met with Mother about the achievement plan, where Mother was given a copy and had the opportunity to ask questions.

As the case progressed, Mother only had two visits with C.A.G. and C.R.G.—both of which occurred in the span of one week in July 2019. While the first visit was unremarkable, with Mother lodging some complaints regarding one child's hair and directing that the other child not swim because it made the child's skin dry—the second visit did not progress well. During the second visit, Mother appeared agitated to the family support worker. The children were hungry and requested snacks from Mother, but Mother had not brought any and was irritated when the children attempted to look in her purse for snacks. According to a social worker, Mother yelled at C.R.G. about why she and her brother were in the State's custody. C.R.G. wept as Mother yelled at her. The family support worker texted the case manager and her supervisor to let them know that she needed help with the situation. Eventually, the staff took the children out of the room while others talked to Mother—who later disclosed that she had taken Xanax and "other

things" prior to the visit. Mother did not show up for the next visit. Thereafter, the children's therapist recommended that subsequent visits with Mother be conducted within a therapeutic setting. Unfortunately, Mother never attempted to schedule any additional visits with the children.

In part due to Mother's continued lack of involvement in the case, the case plan goal was changed from reintegration to adoption by November 2019. Mother failed to complete any court orders or case plan tasks, and her case participation was limited to her appearance at court dates. In February 2020, the State moved to terminate Mother's and Father's parental rights. The State alleged that extensive efforts had been made to assist Mother in stabilizing her situation to provide appropriate care for her children, yet she failed to acknowledge and address her substance abuse issues. The motion also claimed Mother had failed to provide a safe and stable environment for the children, had refused to take advantage of services provided to her, and had not modified her conduct or condition so as to provide appropriate care for the children.

Due to the COVID-19 pandemic, the district court was unable to conduct a hearing on the State's termination motion for over six months. When the hearing was eventually held, the State called numerous social workers and service providers to testify to Mother's inability to make progress on the reintegration plan and her failure to complete nearly all of the district court's orders and tasks requested by SFM and DCF. These witnesses explained Mother's refusal to acknowledge why her children were removed from her custody.

Throughout the case, Mother did not maintain stable housing and failed to keep the caseworkers advised of her living situation—at one point Mother moved across the state but never alerted anyone of her move. Yet at trial, Mother alleged that while she had been living with her family in Wichita, she had recently acquired her own apartment and

4

had provided documentation to SFM. None of the SFM workers had any records to confirm Mother's move or residence.

Mother's failure to communicate during the case inhibited reintegration efforts. According to SFM staff members, Mother had numerous phone numbers, would not return messages, would call from blocked numbers, and would refuse to tell workers where she was calling from when she did call. Even when workers reached Mother, she would often yell at and berate them—blaming the workers for the children being taken from her custody. Over the two-year pendency of the case, Mother only attended five worker-parent meetings—Mother's absence was attributed to the SFM employees' inability to contact her. This communication breakdown further led to the workers' failure to request drug tests as mandated by the court.

Social workers also raised concerns that Mother had not adequately addressed her mental health or substance use issues. While Mother had a clinical assessment scheduled at the time of trial, it was not completed. Although Mother claimed to be seeing a doctor for a substance use evaluation and clinical assessment, the doctor reported that he had not seen Mother for months. In fact, the SFM permanency specialist noted that, "It appears, when looking at the letter [from Mother's therapist], she goes in and sees [a doctor] soon before like a court hearing, or she gets a letter for the court hearing, and that's it." But unfortunately, her attention to her mental health was "very minimal" between court hearings. Mother did not dispute this pattern. Moreover, Mother's substance abuse, which loomed large over the case, was also never meaningfully addressed. After initially testing positive for THC, methamphetamine, and amphetamine, Mother refused to submit to subsequent drug testing—she did eventually take one other UA and tested positive for methamphetamine and cocaine. Mother never completed a court-ordered substance abuse evaluation—conveniently, about 13 weeks before the termination trial Mother began drug treatment. And while Mother admitted the negative impact drugs had played in her life, she denied having any issues with drugs despite her positive tests and the fact that both

C.A.G. and C.R.G. had tested positive for methamphetamine shortly after they were taken from her care.

Out of all of the reintegration case plan tasks, Mother only completed the mandated parenting classes. Although she also claimed to have gained employment and obtained an apartment, she provided no documentation to support her claims. Contrarily, the social workers' records showed that she was only briefly employed for two periods during the entire case.

Beyond not completing the court orders and reintegration case tasks, Mother had only two visits with the children during the pendency of the case. It took approximately 10 months to schedule the first visit because workers could not locate Mother. After the second visit, which ended poorly, Mother did not attempt to schedule any further time with C.A.G. and C.R.G. over the 14 months leading up to the trial. On top of Mother's failure to communicate with the SFM workers, visits also did not occur due to Mother's failure to address her own mental health issues.

The social workers explained that Mother failed to make changes to support reintegration. Although she completed the mandated parenting classes, she did not attempt to adjust her behavior or circumstances based on the parenting class teachings or therapist recommendations. The State also presented substantial evidence regarding the impact of the case on C.A.G. and C.R.G. At the time of the trial, the children had been in custody for two years and, specifically C.A.G. craved stability. Both children had been diagnosed with adjustment disorder with mixed disturbance of emotions and conduct. Fortunately, their prognoses was good with continued therapy. Both children were guarded when speaking about Mother in therapy. C.A.G. told the therapist that the second visit was like how things were when they lived with Mother—she would be nice and then would start yelling. C.A.G. had also been diagnosed with ADHD, was receiving medication management, and was starting the individual education plan process at

school. The therapist testified it would be necessary for a parent to manage his medication and individual therapy, and provide a stable and consistent environment for the continued successful treatment of his ADHD. According to the therapist, for C.R.G.'s prognosis to remain good, she needed "a stable and consistent environment."

In contrast to the State's assertion that Mother failed to maintain stable employment or housing, refused therapy, failed to visit the children or take responsibility for her actions and failed to remain drug free—Mother identified apparent agency or system failures during the case. The children's therapist testified she never received reports of Mother's progress during the case. While she initially testified she received CASA's report that recommended visits with Mother resume, she later testified that she did not receive those reports. The SFM family support worker and SFM permanency specialist both admitted they did not provide updates to the children's therapist. Additionally, the SFM reintegration supervisor admitted that best practices were not always followed in the case. Along these same lines, Mother also alleged that the caseworkers intimidated her and laughed at her and that she never received a list of resources and had to find resources for herself. She also testified that she was deprived of the opportunity for visits with her children and was unable to connect with workers to schedule therapeutic visitation as requested, even after having an attorney attempt to facilitate the communication. However, contrary to Mother's assertion at trial that she tried to schedule the therapeutic visits with C.A.G. and C.R.G.—there was no record of her alleged efforts, such as letters, emails, messages, call logs, notations of anyone she spoke to, or any record of any kind, and no visits were ever scheduled.

After hearing the evidence and the arguments of the parties, the district court concluded that Mother was unfit to parent C.A.G. and C.R.G. under several statutory factors, including:

- K.S.A. 2020 Supp. 38-2269(b)(2) ("conduct toward a child of a physically, emotionally or sexually cruel or abusive nature");

- K.S.A. 2020 Supp. 38-2269(b)(3) ("the use of intoxicating liquors or narcotic or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child");

- K.S.A. 2020 Supp. 38-2269(b)(4) ("physical, mental or emotional abuse or neglect or sexual abuse of a child");

- K.S.A. 2020 Supp. 38-2269(b)(7) ("failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family");

- K.S.A. 2020 Supp. 38-2269(b)(8) ("lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child"); and

- K.S.A. 2020 Supp. 38-2269(b)(9) ("whether, as a result of the actions or inactions attributable to the parent and one or more of the factors listed in subsection (c) apply, the child has been in the custody of the secretary and placed with neither parent for 15 of the most recent 22 months beginning 60 days after the date on which a child in the secretary's custody was removed from the child's home").

The court further concluded that the evidence established that Mother's conduct or condition was unlikely to change in the foreseeable future and that it was in the best interests of C.A.G. and C.R.G. that Mother's rights be terminated. Mother now appeals.

DISCUSSION

On appeal, Mother contends the State presented insufficient evidence to support the district court's determination that her unfitness was unlikely to change in the foreseeable future and that termination of her parental rights was in the best interests of the children. She does not contest the court's finding that she was presently unfit.

8

Parents have a constitutionally protected liberty interest in the relationship with their child. See *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). The parental liberty interest in a relationship with their child has been deemed "perhaps the oldest of the fundamental liberty interests recognized." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Due to the fundamental nature of parental rights, the State may only terminate parental rights upon clear and convincing evidence of parental unfitness. K.S.A. 2020 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014). In fact, prior to termination of parental rights, the State must prove by clear and convincing evidence that: (1) the parent is unfit; (2) the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future; and prove by a preponderance of evidence that (3) termination of parental rights is in the best interests of the child. K.S.A. 2020 Supp. 38-2269(a), (g); *In re R.S.*, 50 Kan. App. 2d at 1115-16.

An appellate court reviews the district court's decision to terminate parental rights by first determining whether the court's findings of fact are supported by clear and convincing evidence. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430-31, 242 P.3d 1168 (2010); *In re B.D.-Y.*, 286 Kan. at 705. Clear and convincing evidence is evidence sufficient to establish "that the truth of the facts asserted is highly probable." 286 Kan. at 697. This is "'an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt.'" *In re Adoption of C.L.*, 308 Kan. 1268, 1278, 427 P.3d 951 (2018). This court reviews the evidence in the light more favorable to the party that prevailed at the district court—in this case, the State—and will not reweigh conflicting evidence or reassess the credibility of witnesses. *In re B.D.-Y.*, 286 Kan. at 705.

A. *The district court relied on clear and convincing evidence that Mother's unfitness was unlikely to change in the foreseeable future.*

Because Mother does not challenge any of the district court's findings on her unfitness at the time of trial, this court does not review the district court's finding of Mother's unfitness under K.S.A. 2020 Supp. 38-2269(b)(2), (3), (4), (7), (8), and (9). An issue not briefed is deemed waived or abandoned. *State v. Arnett*, 307 Kan. 648, 650, 413 P.3d 787 (2018).

After a district court determines a parent is presently unfit, it must determine whether the parent's unfitness is likely to change in the foreseeable future. K.S.A. 2020 Supp. 38-2269(a). The court determines the foreseeable future from the perspective of a child because children and adults have different perceptions of time—and children have a right to permanency within a timeframe that is reasonable to them. *In re M.H.*, 50 Kan. App. 2d 1162, 1170-71, 337 P.3d 711 (2014). The parent's past conduct can be viewed as an indicator of the parent's future behavior. *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018); see *In re M.H.*, No. 117,127, 2017 WL 5951684, at *4 (Kan. App. 2017) (unpublished) ("A parent's actions, not intentions, are the measure to be used in determining the likelihood of change in the foreseeable future.").

Mother asserts that there is not clear and convincing evidence to support the court's finding that her unfitness is unlikely to change in the foreseeable future. She argues that within the two-year pendency of the case she completed one of the most significant tasks by obtaining stable housing and demonstrated progress towards other appropriate changes in her life. Unfortunately, the record does not bolster Mother's assertion. In fact, Mother not only failed to provide any evidence supporting her claim of stable housing—the evidence demonstrated that she failed to complete nearly all of the tasks on her case plan. Although Mother completed the required parenting classes, she failed to obtain substance use evaluations, refused to take drug tests, did not consistently

10

attend individual therapy, scheduled a mandated clinical evaluation only after the termination trial, and failed to demonstrate any effort to see her children after July 2019.

Mother's conduct during the pendency of this case does not demonstrate that her unfitness—which she does not challenge on appeal—was likely to abate in the foreseeable future. Mother was unemployed for a vast majority of the case, failed to maintain stable housing, failed to demonstrate she was drug-free, and only addressed her mental health as court dates approached. Out of all her case plan tasks, Mother only completed parenting classes, and social workers noticed that she refused to apply any of the parenting class lessons. Over the course of two years, she only visited the children twice. While Mother was beginning to address her drug issues—which remained chronic throughout the case—she failed to obtain the required assessments and failed to comply with court-ordered drug testing. Mother's unhurried, incremental progress just before the termination trial does not erase or overcome her two years of inaction toward reintegration. The district court may rely on Mother's past instability and inconsistency, particularly during the two-year pendency when she was provided with support services, to indicate the likelihood of similar future behavior. There was clear and convincing evidence to support the district court's finding that she was likely to remain unfit for the foreseeable future, especially when considering the length of such instability in the eyes of young children.

B. *The district court did not abuse its discretion in determining the best interests of the children.*

After finding a parent unfit and that such unfitness is reasonably likely to continue, a district court next determines, by a preponderance of the evidence, if termination of parental rights is "in the best interests of the child." K.S.A. 2020 Supp. 38-2269(g)(1). This determination gives "primary consideration to the physical, mental and emotional health of the child" and involves weighing termination against the parent's continued

11

presence. K.S.A. 2020 Supp. 38-2269(g)(1); *In re K.R.*, 43 Kan. App. 2d 891, Syl. ¶ 7, 233 P.3d 746 (2010). This court will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court exceeds the latitude it is afforded and abuses its discretion if no reasonable person could agree with its decision or if its conclusion was based on a factual or legal error. 50 Kan. App. 2d at 1118.

Mother contends that C.A.G. and C.R.G. are still young and had many years of childhood remaining, during which she could continue to bond with them and be a significant part of their lives—attempting to undermine the significance given to the length of time she had been out of the children's lives. Mother argues the court abused its discretion because it undervalued the importance of the parent-child relationship.

The district court heard testimony from the children's therapist that they needed a consistent and stable environment to maintain their mental and emotional needs. There was also evidence that the children's physical health would require consistent medication adherence and stability. Mother's behavior throughout the pendency of the case was neither consistent nor stable. Additionally, Mother had not provided for the children's physical needs while they were in her care because both tested positive for methamphetamine, and they were frequently left in the care of others in a home with a rodent problem that lacked running water. Moreover, Mother provided no evidence, other than her own testimony, that she would be able to provide for their physical needs in the foreseeable future.

When a district court is required to make the difficult decision of whether to terminate a parent's rights, it must consider both (1) the physical, mental, and emotional needs of the child; and (2) the nature and strength of the parent-child relationship versus the child's need for permanency. See *In re K.R.*, 43 Kan. App. 2d at 904. The district court considered these important factors in its decision. In the face of C.A.G.'s and

C.R.G.'s need for stability and a home environment where their mental, physical, and emotional needs could be met, it cannot be said that no reasonable person would agree that termination of Mother's parental rights was in the children's best interests, nor that the district court based its decision on an error of fact or law. The district court did not abuse its discretion.

Affirmed.